IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | |
|---|---|
| CITY OF CORALVILLE and CORALVILLE HOSPITALITY CORPORATION,<br><br>        Plaintiffs,<br><br>vs.<br><br>FAULKNERUSA, INC.,<br><br>        Defendant. | **No. 3:05-cv-00027-JEG** |
| COLE + RUSSELL ARCHITECTS, INC.,<br><br>        Plaintiff/Counterclaim Defendant,<br><br>vs.<br><br>FAULKNERUSA, INC.,<br><br>        Defendant/Counterclaim Plaintiff. | **No. 3:05-cv-00022-JEG** |
| FAULKNERUSA, INC.,<br><br>        Third-Party Plaintiff,<br><br>vs.<br><br>CITY OF CORALVILLE, CORALVILLE HOSPITALITY CORPORATION, and WILLIAM BOYD,<br><br>        Third-Party Defendants. | **O R D E R** |

This matter comes before the Court on a Motion for Summary Judgment filed by

FaulknerUSA, Inc., on claims brought by Cole + Russell Architects, Inc., and the City of

Coralville and the Coralville Hospitality Corporation (Clerk's No. 70); a Motion for Partial

Summary Judgment filed by the City of Coralville, the Coralville Hospitality Corporation, and

William Boyd on a claim marshaled by FaulknerUSA, Inc. (Clerk's No. 79); and a Cross-Motion

for Summary Judgment filed by Cole + Russell on a counterclaim brought against Cole + Russell

by FaulknerUSA, Inc. (Clerk's No. 75). The City of Coralville, the Coralville Hospitality

Corporation, and William Boyd are represented by Dennis Johnson, Amy Bjork, and Angela Dralle.  FaulknerUSA, Inc., is represented by John Moreland, Rand Wonio, Alison Werner Smith, John Hayek, and Eric J. Taube.  Cole + Russell Architects, Inc., is represented by Donald Thompson, Paul Calico, and Nichole Lundrigan.  Following a hearing on all pending motions on October 19, 2006, these matters are fully submitted and ready for disposition.

**SUMMARY OF MATERIAL FACTS**

**I.      The Parties.**

        FaulknerUSA, Inc. ("Faulkner"), is a Delaware corporation with its principal place of business in Texas.  Faulkner is in the business of integrating and overseeing design and construction elements of construction projects on a contract basis.  Cole + Russell Architects, Inc. ("Cole + Russell"), is an Ohio corporation with its principal place of business in Ohio.  Cole + Russell is in the business of, among other things, providing architectural design services.

        The City of Coralville (the "City") is a municipal corporation organized under the laws of the State of Iowa and is located in Johnson County, Iowa.  The Coralville Hospitality Corporation ("CHC") is a nonprofit corporation organized under the laws of the State of Iowa with its principal place of business in Coralville, Iowa.  The City established CHC for the purpose of owning and operating a Marriott hotel and conference center that was to be designed, built, and equipped as part of a collaborative effort among CHC, the City, Faulkner, and Cole + Russell (the "Project").  CHC hired William Boyd to serve as CHC's representative in matters related to the Project.[1]

**II.      Factual History of This Litigation.**

        In 2001, the City decided to explore the prospect of building a Marriott hotel and conference center as part of an urban renewal effort.  For tax purposes, the City created CHC, a City-

---

[1] Boyd, CHC, and the City are collectively referred to herein as the "Coralville Parties."

owned corporation that would own and operate the hotel.  The interests of CHC and the City are identical for purposes of the pending motions.

The Project was to be financed through the issuance of bonds.  After the bonds were paid in full, ownership was to revert back to the City.  In 2001, the City and CHC issued a request for proposals from various developers.  Faulkner (then known as The Landmark Organization, Inc.) submitted a proposal that the City and CHC accepted in 2002.

Faulkner was ultimately selected to serve as the construction manager for the Project.  Cole + Russell was selected as the architect for the Project.  Initially, Cole + Russell performed an amount of design work directly for the City, and CHC and was paid directly for those services.  As work progressed, Cole + Russell worked for Faulkner, and payments for Cole + Russell's services were routed from the City and CHC through Faulkner.  Precisely which party was responsible for the payment of Cole + Russell's fees is an issue of fierce contention.

### A.  Contracts Among the Parties.

A menu of contracts guided relationships between Faulkner, Cole + Russell, CHC, and the City.  Relevant terms are presented in greater detail below; a primer is presented here.

#### 1.  Faulkner–CHC/City Agreements.

##### a.  The Letter of November 26, 2002.

The first document of consequence is a letter dated November 26, 2002, sent from Robert Gallup, a Faulkner representative, to Boyd.  In the November 26 letter, Faulkner proposed to build a 250-room full-service Marriott hotel and conference center, with 60,000 square feet of meeting and exhibit space, a full-service restaurant, and other amenities.  Faulkner submitted a Project budget in the amount of approximately $57-million.

##### b.  The March 13, 2003, Memorandum of Understanding.

Faulkner and CHC entered into a Memorandum of Understanding dated March 13, 2003.  The purpose of the Memorandum of Understanding was to "ensure that all parties ha[d] a mutual

understanding of certain key points" before beginning negotiations for definitive agreements solidifying arrangements regarding the design, development, and construction of the Project. Mem. of Understanding, at 1.  Pursuant to the Memorandum of Understanding, Faulkner was to receive payment of a fixed fee, a percentage of the costs of the Project, and other additional amounts.  The Memorandum of Understanding reflected that Faulkner and CHC agreed to a preliminary budget of approximately $57-million for the Project.  The parties agreed to enter into later agreements establishing a definitive budget not to exceed a 5 percent variance from the preliminary figure.  Under the Memorandum of Understanding, an architect – presumably Cole + Russell – was to serve as Faulkner's subcontractor and design the Project pursuant to a fee schedule.

At some point after execution of the Memorandum of Understanding, work on the Project experienced some delay resulting from litigation threatened by citizens attempting to stop work on the Project.  Specifically, a group called Master Builders, which represented contractors in the State of Iowa, threatened to file a lawsuit to stop the project because it was not proceeding through a public bidding process and, instead, was going through a design/build process with Faulkner as the designer and builder.

### c.    The April 13, 2004, Preconstruction Services Agreement.

To alleviate the threat of a lawsuit by Master Builders, Faulkner and CHC entered into a "Preconstruction Services Agreement" on April 13, 2004.  The Preconstruction Services Agreement contemplated that Faulkner would serve as the construction manager and in that capacity would be responsible for performing defined "preconstruction work."  See Preconstruction Services Agreement, at 1-2.  Pursuant to the Preconstruction Services Agreement, CHC was to assign to Faulkner an Architectural Design Services Agreement existing between CHC and Cole + Russell.  In exchange, Faulkner would receive $475,000 plus other fees.  The agreement listed

4

a preliminary budget of $60,213,000 but contemplated further negotiations to finalize a budget within a 5 percent variance of that figure.

### 2.   Faulkner – Cole + Russell Agreements.

On August 11, 2003, CHC and Cole + Russell entered into an Architectural Design Services Agreement pursuant to which Cole + Russell provided initial schematic designs on the Project.  As noted, this agreement was assigned by CHC to Faulkner under the Preconstruction Services Agreement.

### a.   The April 28, 2004, Letter and Draft Design Services Agreements.

By letter dated April 28, 2004, Robert Gallup, a Faulkner representative, sent to John Russell of Cole + Russell a letter agreement (the "Letter Agreement") authorizing Cole + Russell to proceed with design services for the Project pursuant to an attached draft Design Services Agreement.

### b.   The Final Design Services Agreement.

By November 2004, Cole + Russell and Faulkner had finished negotiating the terms of a final Design Services Agreement.  On behalf of Cole + Russell, John Russell signed the final version and forwarded it to Faulkner for signature.  No representative from Faulkner signed the final Design Services Agreement.  For purposes of the pending motions, Cole + Russell and Faulkner agree that the draft and final versions are identical in pertinent part.

### 3.   Summary.

There are seven documents of importance:

- ▸ Faulkner's November 26, 2002, letter to CHC.
- ▸ the Memorandum of Understanding between Faulkner and CHC dated March 13, 2003.
- ▸ the Architectural Design Services Agreement between CHC and Cole + Russell assigned to Faulkner by the Preconstruction Services Agreement.
- ▸ the Preconstruction Agreement between Faulkner and CHC dated April 13, 2004.
- ▸ the Letter Agreement dated April 28, 2004, between Faulkner and Cole + Russell.

5

▸    the draft Design Services Agreement dated April 28, 2004, between Faulkner and Cole + Russell.

▸    the final Design Services Agreement between Faulkner and Cole + Russell finalized in November 2004.

**B.     Events Giving Rise to This Litigation.**

On November 19, 2004, a portion of the Project was let for public bids.  Bids were solicited for only the construction of the hotel and conference center and did not include work on parking ramps and other items.  Faulkner had predicted bids for the portion let to be around $37-million.  Three bids from reputable contractors were submitted ranging in price from $50-million to $54-million.  Following an unsuccessful attempt to proceed under the budgets prepared by Faulkner, CHC terminated the Preconstruction Services Agreement.  Ultimately, the City and CHC engaged other entities to build the Project.  Certain fees totaling $667,206 for services performed by Cole + Russell remain unpaid, which Cole + Russell is demanding from Faulkner.  The City and CHC seek reimbursement from Faulkner of approximately $2.7-million that has already been expended to compensate Faulkner and its consultants for their efforts on the Project.

**III.    Procedural History of This Litigation.**

**A.     City of Coralville v. FaulknerUSA, Inc. (No. 3:05-cv-00027).**

On February 23, 2005, the City and CHC filed a four-count Petition in the Iowa District Court in and for Johnson County against Faulkner.  See Pet. at Law & Jury Demand, City of Coralville v. FaulknerUSA, Inc., No. LACV 065558 (Iowa Dist. Ct. Feb. 23, 2005).  In Count I, CHC and the City seek rescission of the Preconstruction Services Agreement, arguing that Faulkner represented to the City and CHC that the Project was proceeding within projected budgets when it was not.  On the basis that the City and CHC justifiably relied on Faulkner's representations, CHC and the City assert rescission is an appropriate remedy, as is requiring Faulkner to reimburse the City and CHC for amounts spent in reliance on Faulkner's alleged

misrepresentations.  Counts II through IV set forth fraudulent misrepresentation, negligent misrepresentation, and breach of fiduciary duty claims, respectively.

On March 17, 2005, Faulkner removed the action to this Court and on April 13, 2005, filed its answer and a breach of contract counterclaim against the City and CHC.  For its counterclaim, Faulkner alleged the City and CHC breached the Memorandum of Understanding and Preconstruction Services Agreement by failing to make payments owed for preconstruction services rendered by Faulkner and for architectural design services performed by Cole + Russell for which Cole + Russell seeks payment in an action against Faulkner.

**B.    Cole + Russell Architects, Inc.  v. FaulknerUSA, Inc. (No. 3:05-cv-00022).**

On February 3, 2005, Cole + Russell initiated a lawsuit against Faulkner in the Iowa District Court in and for Johnson County.  See Pet. at Law & Jury Demand, Cole + Russell Architects, Inc. v. FaulknerUSA, Inc., No. LACV 065495 (Iowa Dist. Ct. Feb. 3, 2003).  Cole + Russell sought damages in an amount equivalent to architectural services provided pursuant to the Letter Agreement and draft Design Services Agreement.  Cole + Russell advanced breach of contract, quantum meruit/unjust enrichment, and promissory estoppel causes of action.

On March 3, 2005, Faulkner removed the action to this Court and on March 8, 2005, filed an answer and a Third-Party Complaint against the City and CHC.  In Count I of its five-count Third-Party Complaint, Faulkner set forth a breach of contract claim against the City and CHC premised on alleged breaches of the Preconstruction Services Agreement.  Faulkner claimed the City and CHC breached the Preconstruction Services Agreement by failing to pay Faulkner the cost of expenses related to design services performed by Cole + Russell.  In Count II, Faulkner sought indemnity from the City and CHC for any amount Faulkner could later be forced to pay to Cole + Russell resulting from the City and CHC's failure to pay the costs of Cole + Russell's design services.  The Third-Party Complaint also sought contribution from the City and CHC, and contained claims that the City and CHC were unjustly enriched by receiving the benefit of

Cole + Russell's design services without making payment for the same.  Finally, Faulkner sought to recover from the City and CHC on a theory of promissory estoppel.

### C.   Consolidation and Subsequent Amendments.

On April 13, 2005, Faulkner moved to consolidate these parallel proceedings.  United States Magistrate Judge Celeste F. Bremer granted Faulkner's motion on May 18, 2005.[2]  After obtaining leave to amend, Faulkner filed an Amended Third-Party Complaint on February 22, 2006.  Therein, Faulkner added Boyd as a third-party defendant and set forth as Count VI a tortious interference with an existing contract cause of action.  Also on February 22, 2006, Faulkner filed a counterclaim against Cole + Russell, alleging Cole + Russell breached an agreement – Faulkner does not specify which – entitling Faulkner to damages.

Cole + Russell filed a First Amended and Substituted Complaint and Jury Demand [hereinafter "First Amended Complaint"] on March 20, 2006, attaching a then-recently discovered document as an exhibit and adding factual allegations.  Cole + Russell's First Amended Complaint did "not alter any of the allegations in [its state-court Petition or] add new claims" but instead clarified "the existing substantive issues in this case."  CRA's Br. in Support of Agreed Mot. for Leave to File First Am. & Substituted Compl. & Jury Demand 5.

### IV.   The Pending Motions.

### A.   Faulkner's Motion for Summary Judgment.

Faulkner's Motion for Summary Judgment consists of three parts.  First, Faulkner argues Cole + Russell is contractually barred from seeking from Faulkner payments for services Cole + Russell performed because the Letter Agreement and Design Services Agreements require Faulkner to pay Cole + Russell only if and when Faulkner is compensated for those services by CHC.  Faulkner claims that because it has received payment from neither CHC nor the City,

---

[2] On June 23, 2005, Magistrate Judge Bremer vacated her May 18 Order regarding consolidation because the "lead case number" was entered in error.  Other provisions of the May 18 Order remain intact.

Cole + Russell cannot recover.  Second, Faulkner claims the City and CHC are contractually required to pay Faulkner's fees and expenses incurred as a result of its participation in the Project, including any fees claimed by Cole + Russell in its action against Faulkner.  Finally, Faulkner argues the City and CHC cannot seek damages from Faulkner because the Precon-struction Services Agreement purportedly limits the financial exposure of the signatories thereto.

### B.    The Coralville Parties' Motion for Partial Summary Judgment.

In their motion, the Coralville Parties seek dismissal of Count VI of Faulkner's First Amended Third-Party Complaint.  In Count VI, Faulkner alleges the Coralville Parties tortiously interfered with contracts between Cole + Russell and Faulkner.  Faulkner argues contracts between itself and Cole + Russell permitted only Faulkner to order or request Cole + Russell to perform additional architectural services and make design changes, but the Coralville Parties ordered such changes and services without Faulkner's consent or knowledge.  Faulkner claims the Coralville Parties must pay to Faulkner any amount claimed by Cole + Russell for additional services and design changes requested by the Coralville Parties.

The Coralville Parties argue there is no evidence Cole + Russell charged or is seeking to recover from Faulkner monies for architectural services rendered at the direction of the Coralville Parties without Faulkner's knowledge and consent.  Therefore, the Coralville Parties argue, Faulkner cannot prove damages resulted as a result of any interference they caused.

### C.    Cole + Russell's Cross-Motion for Summary Judgment.

The goal of Cole + Russell's Cross-Motion for Summary Judgment is the dismissal of Faulkner's counterclaim.  In its counterclaim, Faulkner alleges Cole + Russell breached the draft Design Services Agreement by communicating directly with the City and CHC and by incor-porating their suggestions and requests into Cole + Russell's design.  Cole + Russell claims this conduct was not prohibited by the Design Services Agreement; in fact, according to Cole + Russell, the Design Services Agreement encouraged such communication.

**DISCUSSION**

I.      **Legal Standards for Motions for Summary Judgment.**

Federal Rule of Civil Procedure 56 permits parties against whom claims are brought to move for summary judgment. Fed. R. Civ. P. 56(a)-(b).  Under Rule 56, "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Id. R. 56(c). A dispute about a fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also id. at 249 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." (citing First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968))); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." (quotation marks omitted)).

A genuine dispute about a fact is material if it "might affect the outcome of the suit under the governing law."  Anderson, 477 U.S. at 248.  The materiality element is not met if the record contains only disputes about facts that are "irrelevant or unnecessary."  Id.  And if the evidence supporting a claim or defense "is merely colorable or is not significantly probative, summary judgment may be granted."  Id. at 249-50 (citing Cities Serv., 391 U.S. at 290; Dombrowski v. Eastland, 387 U.S. 82 (1967) (per curiam)); see also Matsushita Elec. Indus. Co., 475 U.S. at 586 (explaining that a party opposing a properly supported motion "must do more than simply show that there is some metaphysical doubt as to the material facts").  Applicable substantive law governs which facts are critical and which are irrelevant.  Anderson, 477 U.S. at 248; see also

Nebraska v. Wyoming, 507 U.S. 584, 590 (1993) (when deciding if a material factual dispute exists, a court must "view[] the evidence through the prism of the controlling legal standard").

Procedurally, the moving party bears the burden of informing the Court of the basis for its motion by pointing to places in the record it believes demonstrate the absence of genuine issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).[3]  The resisting party may not then """rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."""  Anderson, 477 U.S. at 248 (quoting First Nat'l Bank of Ariz., 391 U.S. at 288, in turn quoting Fed. R. Civ. P. 56(e) (omission by the Anderson Court)); see Celotex Corp., 477 U.S. at 324 (demanding the non-moving party resist a properly supported motion "by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file" and "designate specific facts showing that there is a genuine issue for trial" (quotation marks omitted)).  If a party bears the burden of proof at trial, summary judgment is appropriate against that party if it "fails to make a showing suffi-cient to establish the existence of an element essential to that party's case."  Celotex Corp., 477 U.S. at 322; accord Nebraska v. Wyoming, 507 U.S. at 590; Lujan v. Nat'l Wildlife Found., 497 U.S. 871, 884 (1990).

Throughout this process, the Court must view the evidence and justifiable inferences from the record in a light favorable to the nonmoving party, see Anderson, 477 U.S. at 255, presume the nonmoving party's version of a disputed issue is the correct one, Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992); Arizona v. Maricopa County Med. Soc'y, 457 U.S. 332, 339 (1982), but steer clear of performing jury functions such as making "[c]redibility determinations, the weighing of the evidence, and the drawing of

---

[3] This principle renders incorrect Faulkner's position at oral argument that a moving party need not point to places in the record showing the absence of genuine issues of material fact.  To borrow Faulkner's analogy, while it is unnecessary for a moving party to create a "strawman" of a factual argument and then destroy it, it is necessary for a moving party to show no facts with record support exist with which one could create a strawman.

legitimate inferences from the facts," <u>Anderson</u>, 477 U.S. at 255.  If at the conclusion of this process "'it is quite clear what the truth is,'" then summary judgment may be granted, "'[for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try.'"  <u>Poller v. Columbia Broad. Sys., Inc.</u>, 368 U.S. 464, 467 (1962) (quoting <u>Sartor v. Ark. Natural Gas Corp.</u>, 321 U.S. 620, 627 (1944) (alteration by the <u>Poller</u> Court)).

## II.      Faulkner's Motion for Summary Judgment.

Faulkner seeks summary judgment against CHC and the City in their action against Faulkner, and against Cole + Russell in its action against Faulkner.  Faulkner has parsed its argument into three segments.  First, Faulkner focuses on the claims in Cole + Russell's First Amended Complaint, claiming that under the Letter Agreement and Design Services Agreements, Cole + Russell cannot seek payment from Faulkner for services Cole + Russell performed unless and until Faulkner is compensated for those services by the City or CHC.

Faulkner then turns to the claims brought by CHC and the City.  Faulkner first argues that the City and CHC are contractually required to pay the fees demanded by Cole + Russell.  Second, Faulkner claims the City and CHC are barred from seeking damages from Faulkner pursuant to the Preconstruction Services Agreement, which, Faulkner claims, generally insulates the liability of parties to that contract.

The Court, like Faulkner, begins with the claims brought by Cole + Russell.

### A.      Faulkner's Motion for Summary Judgment on Cole + Russell's Claims.

The current version of Cole + Russell's Complaint contains three counts tied to services for which it has not been paid by Faulkner.  In Count I, Cole + Russell alleges Faulkner breached the final Design Services Agreement by failing to pay $667,206 representing the value of services Cole + Russell provided to Faulkner.  In Count II, Cole + Russell brings a quantum meruit/unjust enrichment claim against Faulkner, alleging Faulkner has not paid Cole + Russell

for services provided for Faulkner's benefit at Faulkner's request and with its knowledge.  Count III sets forth a promissory estoppel claim premised on substantially the same facts as Count II.

Faulkner argues Count I fails because the Design Services Agreement prevents Cole + Russell from seeking payments from Faulkner until Faulkner receives payment for the same from the City or CHC.  Because neither the City nor CHC has compensated Faulkner for those services for which Cole + Russell has not been paid, Faulkner concludes, Faulkner owes Cole + Russell nothing.

Faulkner contends that because Count I fails, and because Cole + Russell incorporated its breach of contract cause of action into the remaining counts through general incorporation paragraphs in its Complaint, Counts II and III fail as well.

### 1.   Material Facts.

Pursuant to the Letter Agreement, Faulkner authorized Cole + Russell to "proceed with [design] services" in accordance with a draft Design Services Agreement while Cole + Russell and Faulkner negotiated a final Design Services Agreement.  Regarding payment for Cole + Russell's services, Faulkner wrote,

> We understand that through prior commitments and payments received by you for services related to this agreement you have received payment to date in the amount of $955,233.00 and the balance of fees to be earned shall not exceed $1,770,779.00.  Progress billings may be invoiced monthly and shall be due within thirty (30) days subject to receipt of payment from [CHC]. From our communications of this date we understand you are ready to commence work immediately and we look forward to working with you further on this project.

Letter Agreement 3 (emphasis added).  The payments Cole + Russell had previously received were made pursuant to an agreement between CHC and Cole + Russell.

By November 2004, Cole + Russell and Faulkner had completed negotiations on a final Design Services Agreement.  John Russell signed the final version and forwarded it to Faulkner

13

for signature.[4]  Although no Faulkner representative signed the final Design Services Agreement, Faulkner has stipulated to the truth of certain of Cole + Russell's factual assertions for the purposes of this motion, including Cole + Russell's allegation that the final Design Services Agreement is a binding contract.  See FaulknerUSA, Inc.'s Mot. for Summ. J. 3, 4 (conceding that "[f]or the purposes of this Motion, [Faulkner] will adopt the afore-mentioned [sic] pleadings of [Cole + Russell] as being true," including allegations that the final Design Services Agreement "'is a valid and binding agreement between [Cole + Russell] and [Faulkner]'" (quoting First Am. Compl. ¶ 7)); see also Faulkner USA, Inc.'s Reply to Cole + Russell's Resistance to Mot. for Summ. J. 1.  As a result, the Court will, as Faulkner does, treat the final Design Services Agreement as a binding contract for the purposes of this motion.[5]  This concession has significant parol evidence implications.

The Design Services Agreement required Cole + Russell to perform, among other tasks, certain Basic Services defined in the agreement.  The Design Services Agreement also set forth

---

[4] Cole + Russell explains why it believes the final version was not signed:

> After bids for the Project were opened publicly (on or about November 10, 2004), [Faulkner] unsuccessfully sought to resolve problems resulting from bids exceeding [Faulkner]'s budget.  On December 2, 2004, the City advised [Faulkner] that the City would permit other general contractors to participate in a different design/build approach for the Project.  As a result of the City's action, [Cole + Russell] believes and therefore asserts that [Faulkner] felt it no longer had incentive to sign the final Design Services Agreement if the Project would not go forward in the manner contemplated by [Faulkner] and [Cole + Russell] when they negotiated and agreed to the terms of the final Design Services Agreement signed by Russell.  Despite agreeing to the terms of the parties' arrangement and agreement as set forth in the final Design Services Agreement, and ordering and accepting services from Cole + Russell in anticipation that such agreement would be concluded, [Faulkner] did not sign the Design Services Agreement.

First Am. Compl. ¶ 8.  Faulkner "[a]dmits that there were unresolvable problems resulting from the excessive nature of public bids," but denies Cole + Russell's other allegations. Ans. to First Am. Compl. ¶ 8.

[5] Citations to the "Design Services Agreement" in this Part refer to the final Design Services Agreement.

certain Additional Services, defined as those services performed outside the scope of the Basic

Services.  Cole + Russell claims that it performed all Basic and Additional Services related to the

design development and construction documents related to the Project.  Nevertheless, Cole +

Russell argues, Faulkner has not remitted the sum of $667,266 for architectural fees performed

under the Design Services Agreement.  Faulkner argues that pursuant to the Design Services

Agreement, Cole + Russell cannot collect until CHC or the City remits to Faulkner an

identical amount.

Article 6 of the Design Services Agreement contains terms governing Cole + Russell's

compensation, and provides in relevant part as follows:

> 6.  [Faulkner] shall compensate the Architect for all services provided to
> the Project by Architect and its Consultants, as set forth in this Article 6.
> . . . .
> 6.1[.A] . . . .  The Architect's compensation for its Basic Services shall be
> paid monthly throughout the course of the Project, based upon Applications
> for Payment that are submitted to and approved by [Faulkner].
> . . . .
> 6.2.3 The Architect's compensation for its Additional Services shall be paid
> monthly as they are incurred and approved by [Faulkner] throughout the
> course of the Project based upon Applications for Payment that are
> submitted to and approved by [Faulkner].
> . . . .
> 6.3.2 The expenses incurred by Architect and its Consultants in connection
> with its provision of Additional Services that comply with the provisions of
> Subparagraph 6.2.1 shall be paid monthly as they are incurred and approved
> by [Faulkner] throughout the course of the Project, on the basis of a multiple
> of one and one-tenth (1.1) times the amounts actually expended.
> . . . .
> 6.4.1 The rate of interest for past-due payment shall be as follows:
>> Architect understands that [CHC]'s payment schedule is 35 days for
>> invoices submitted prior to the 5th of each month.  Amounts unpaid for ten
>> (10) calendars [sic] days after [CHC]'s payment cycle (therefore, Architect
>> will be paid within 45 to 75 days from Faulkner's receipt of Architects [sic]
>> invoices) shall bear interest at [a predetermined rate].

Design Services Agreement ¶ 6, .1.A, .2.3, .3.2, .4.1 (emphases added).  Article 7 sets forth,

among other things, terms for payment for work completed.  Two sections are relevant here:

>    7.2    Payments for Basic Service [sic], Additional Services, and
>    Reimbursable Expenses provided for in this Agreement <u>shall be made
>    monthly</u>, as they are incurred, provided that the Architect has submitted an
>    Application for Payment in a timely manner as set forth in this Article 7.
>    . . . .
>    7.7.    [Faulkner] shall make payment of all undisputed amounts due to the
>    Architect <u>within ten (10) calendar days of receipt of payment to [Faulkner]
>    as provided in 6.4.1.</u>

Design Services Agreement ¶ 7.2, .7.  Gallup explained the billing process envisioned by these

terms as follows:

>    Q:    . . . [T]he idea or concept here was that Cole + Russell would perform
>    architectural services or its consultants would and it would bill Faulkner[]
>    for those services, right?
>    A:    Correct.
>    Q:    And that you would turn around then and bill the City of Coralville or
>    [CHC] for the amount that Cole + Russell billed you?
>    A:    Correct.
>    Q:    So for Cole + Russell's progress payments to be invoiced monthly and
>    due within 30 days . . . subject to Faulkner's receipt of payment from
>    [CHC], Faulkner had to actually [b]ill the City of Coralville or [CHC]
>    within that 30-day period?
>    A:    Yes.
>    Q:    And Faulkner had to bill [CHC] or the City for the amount of the fees
>    that Cole + Russell had billed Faulkner, right?
>    A::    That's correct.
>    Q:    And do you agree that the amount that [CHC] and the City agreed to
>    pay Faulkner for architectural engineering fees on the project had to match
>    up with what Faulkner had agreed to pay Cole + Russell?
>    A:    I agree with that, yeah.
>    Q:    And if it didn't, at some point when Cole + Russell billed Faulkner,
>    most likely at the end of the project, if there was a disconnect there or they
>    didn't match up, the whole concept wouldn't work, the City would refuse to
>    pay Faulkner because it would have already paid Faulkner all it had agreed
>    to pay in architectural and engineering fees?
>    A:    I understand that that's being raised now.
>    Q:    I mean, that's – that's the problem, isn't it?
>    A:    That's right.
>    Q:    [I]n order for this language to work, if you agreed to pay Cole +
>    Russell X number of dollars, you had to make sure that the City of
>    Coralville agreed to pay you the same amount for architectural and
>    engineering fees?
>    A:    That's right, yeah.  And I thought that was the agreement. . . .

> Q:    . . . [O]utside the confines of [the Letter Agreement] . . .did you ever
> have any understanding with Cole + Russell in which you said, look we've
> agreed to pay you $2,726,012 . . . [but i]f the City or [CHC] won't agree to
> pay us that amount, but will only agree to pay $2,200,000, you're at risk for
> the difference?
> A:    I didn't have that conversation because at the time I sent them [the
> Letter Agreement] I didn't think that that discrepancy was at issue.
> Q:    So that wasn't part of the agreement when you sent the [Letter
> Agreement], was it?
> A:    No. No.

Gallup Dep. 135:6-138:7, Mar. 27, 2006 (emphases added).  Gallup's testimony reveals that if a

discrepancy arose between the amount Cole + Russell billed Faulkner and the amount CHC or

the City remitted to Faulkner to pay for Cole + Russell's services, the parties had no agreement

that allowed Faulkner to seek additional money from CHC or the City while delaying payment to

Cole + Russell.

On December 15, 2004, Jim Fausett, writing for the City and CHC, terminated the Pre-

construction Services Agreement.  Fausett wrote, in relevant part,

> CHC and the City have paid, either to Faulkner or directly to [Cole +
> Russell], the full amount contracted and budgeted under the [Preconstruc-
> tion Services] Agreement for [Cole + Russell]'s services as stipulated in the
> [Preconstruction Services] Agreement for services performed to date by
> [Cole + Russell].  Such amount is shown on Exhibit A to the [Preconstruc-
> tion Services] Agreement and has been communicated as such by Faulkner
> representatives to the City whenever the budget for the Project was
> discussed.  The City has not authorized any increases to such amount in the
> manner as provided in Section 1 to the [Preconstruction Services] Agree-
> ment.  It is Faulkner's responsibility to pay any remaining amounts owed to
> [Cole + Russell] and immediately deliver to CHC the ownership of (and
> electronic copies of) the plans and specifications in order for the CHC [sic]
> to proceed forward with its plan to solicit proposals for turn-key lease
> purchase agreements to construct the Project.

Faulkner App. 89-90.  Kelly Hayworth, Coralville's City Manager, explained why the City and

CHC refused to compensate Faulkner the amount Cole + Russell claimed remained unpaid:

> Q:    Now, I suspect you remember that after the bids came in Faulkner
> attempted to get the City or [CHC] to pay the amount that Cole + Russell

claimed was due when it filed this lawsuit, which is approximately
$677,000.  Do you remember that?

A:    Yes.

Q:    Who made the ultimate decision [not to pay Faulkner]?

A:    I believe in that instance – I believe that it would have been – it was a
decision both by [CHC] and the city council.

. . . .

Q:    . . . .  What I'm asking is when you made your recommendation to the
[city] council not to pay Faulkner the amount that Cole + Russell claimed it
was owed, I want to know what you told the council in terms of a reason for
that recommendation or reasons.

A:    I believe that we had a contract with Faulkner that outlined what we
were to pay for architects' fees, and I believe that we had paid those
fees fully.

. . . .

Q:    How about [CHC], when you made the recommendation to that entity,
did you explain the reason for your recommendation?

A:    Yes.

Q:    And what reason did you give?

A:    The same reason, that I believed we had compensated Faulkner for all
of the fees that were due.

Q:    And in doing so . . . did you have any knowledge of what fees
Faulkner had agreed to pay Cole + Russell?

A:    Not at that time.

Q:    Your only focus was on what the City had agreed to pay Faulkner for
design fees?

A:    Correct.

Hayworth Dep. 18:24-19:5; 19:15-18; 20:22-21:23, Mar. 3, 2006.  In other words, Hayworth

believed Faulkner was owed nothing more than amounts budgeted in the Preconstruction Ser-

vices Agreement because that amount was not adjusted.  Because the budgeted amount had been

exhausted, CHC and the City believed Faulkner was owed nothing more.

      Cole + Russell notes that any fee dispute between CHC, the City, and Faulkner is a

dispute among those parties and that it is entitled to its fees regardless of the outcome of

that dispute.

2.    **Discussion.**

Faulkner argues the Design Services Agreement establishes that fees owed to Cole +

Russell are not due until Faulkner receives payment from either the City or CHC for services

performed by Cole + Russell.  No breach of the Design Services Agreement occurred, the argu-

ment goes, because Cole + Russell is owed nothing at this point in time.  As a result, Faulkner

argues, it is entitled to summary judgment on Cole + Russell's breach of contract claim.

Cole + Russell's response is two-pronged.  First, Cole + Russell argues the premise of

Faulkner's argument – that payment from the City or CHC is a condition precedent to Faulkner's

duty to pay Cole + Russell – is faulty.  Second, Cole + Russell argues that even if Cole + Russell

and Faulkner did agree that Faulkner must pay only after receiving payment from the City or

CHC, Faulkner could only delay payment until either the City or CHC paid Faulkner or

Faulkner's claim against the City or CHC for such fees is defeated.  Under either scenario, Cole

+ Russell argues, summary judgment is improper.

### a.    Evidence Available for Consideration.

The parties spend much time discussing how an integration clause in the Design Services

Agreement affects the Court's ability to consider the Letter Agreement and Gallup's testimony

as aids to illuminating what was the payment structure among the parties.  Cole + Russell argues

that while the parol evidence rule forbids consideration of extrinsic evidence offered solely for

the purpose of varying, adding to, or deleting terms from an integrated agreement, the rule does

not prevent consideration of extrinsic evidence to explain the meaning of language in such an

agreement.  Therefore, Cole + Russell argues, because Gallup's testimony demonstrates the

payment provisions in the Design Services Agreement are "pay-when-paid" clauses (and not

"pay-if-paid" clauses),[6] Gallup's testimony should be considered.  Additionally, according to

---

[6] Cole + Russell busies itself distinguishing "pay-when-paid" clauses from "pay-if-paid" clauses, arguing the payment terms in the Design Services Agreement fall into the former category. "Pay-when-paid" clauses permit a general contractor to delay payment to a subcontractor until

Cole + Russell, because the Letter Agreement contains payment terms different from those in the Design Services Agreement and does nothing to explain or illustrate the way the Design Services Agreement was applied, it should not be considered under the parol evidence rule.

###### i.   Parol Evidence Principles.

The threshold question when deciding whether extrinsic evidence may be analyzed is whether the contract is integrated and if so, whether the integration is complete or partial.  See Hunter v. Bd. of Trustees of Broadlawns Med. Ctr., 481 N.W.2d 510, 514 (Iowa 1992) ("The Restatement (Second) of Contracts provides that '[w]hether there is an integrated agreement is to be determined by the court as a question preliminary to determination of a question of interpretation or to the application of the parol evidence rule.'" (quoting Restatement (Second) of Contracts § 209(2) (1981)).  The difference is material because if "an agreement is deemed fully integrated, the parol evidence rule prevents the receipt of any extrinsic evidence to contradict (or even supplement) the terms of the written agreement," Whalen v. Connelly, 545 N.W.2d 284, 290 (Iowa 1996); accord Smidt v. Porter, 695 N.W.2d 9, 21 (Iowa 2005); see also Restatement (Second) of Contracts § 213(2) & cmt. c ("A binding completely integrated agreement discharges prior agreements to the extent that they are within its scope."), whereas if an agreement is only partially integrated, prior agreements survive to the extent that they are not inconsistent with the contract in question, see Restatement (Second) of Contracts §§ 209 cmt. a ("An integrated agreement supersedes contrary prior statements, and a completely integrated agreement supersedes even consistent additional terms."), 213(1) ("A binding integrated agreement

---

after the general contractor has received payment from the owner.  According to Cole + Russell, clauses of this type do not allow a general contractor to forever withhold payment but instead impose a "timing" requirement obligating the general contractor to pay the subcontractor when the owner pays the general contractor, but if the owner does not compensate the general contractor, within a "reasonable" time after performance of work.  A "pay-if-paid" clause, Cole + Russell argues, creates a condition precedent to payment such that a general contractor is obligated to pay a subcontractor only if or only when the owner pays the general contractor.  While the distinction is conceptually helpful, the Court's analysis is guided not by the labels Cole + Russell affixes to the contracts' terms but instead by the terms themselves.

discharges prior agreements to the extent that it is inconsistent with them.").  The parol evidence rule does not prohibit consideration of negotiations occurring after the formation of a contract to show modification of the contract under consideration.  Smidt, 695 N.W.2d at 21; Whalen, 545 N.W.2d at 291; Baie v. Nordstrom, 29 N.W.2d 211, 213 (Iowa 1947).

"An integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement."  Restatement (Second) of Contracts § 209(1).  An agreement is deemed "fully integrated when the parties involved adopt a writing or writings as the final and complete expression of the agreement."  Whalen, 545 N.W.2d at 290 (citing Montgomery Props. Corp. v. Economy Forms Corp., 305 N.W.2d 470, 476 (Iowa 1981)); see also Restatement (Second) of Contracts § 209(1).  A partially integrated agreement is any integrated agreement that is not completely integrated.  Restatement (Second) of Contracts § 210(2).  Whether an agreement is completely integrated is typically an issue of fact, determined by the totality of the evidence.  Whalen, 545 N.W.2d at 290; see Hunter, 481 N.W.2d at 514; Young v. Cedar County Work Activity Ctr., Inc., 418 N.W.2d 844, 848 (Iowa 1987); see also Restatement (Second) of Contracts § 209 cmt. c.

## ii.   Analysis.

Paragraph 13.3 of the Design Services Agreement contains an integration clause, as follows:

> This document represents the complete, entire and fully integrated agree-ment between [Faulkner] and [Cole + Russell] and supersedes all prior negotiations, letters of authorization, representations or agreement [sic], either written or oral with respect to the Project, including the agreement referenced in 2.1.1.  This Agreement may be amended only by written instrument signed by both [Faulkner] and [Cole + Russell].

Design Services Agreement ¶ 13.3.[7]

---

[7] The agreement referenced in section 2.1.1 is the agreement between Cole + Russell and CHC under which Cole + Russell completed a schematic design and other construction documents. See Design Services Agreement ¶ 2.1.1 & ex. C.

The Supreme Court of Iowa has held that "the parol evidence rule applies where a 'hand-crafted contract contains an integration clause, where the parties were sophisticated business persons represented by counsel and of equal bargaining strength, and where terms of the alleged oral agreement reasonably would be expected to be included in the . . . agreement.'" Whalen, 545 N.W.2d at 291 (quoting Montgomery Props. Corp., 305 N.W.2d at 476) (omission by the Whalen court).  Here, there is no purported oral agreement inconsistent with or containing terms additional to the Design Services Agreement.  The parties do not claim to be unsophisticated, and the record reveals they are not.  The integration clause quoted above shows the parties intended the Design Services Agreement to be "the complete, entire and fully integrated agree-ment" and wished it to "supercede[] all prior negotiations, letters of authorization, representa-tions or agreement [sic], either written or oral with respect to the Project" (emphasis added).  Not only does the Design Services Agreement purport to be the final agreement between the parties, it purports to be the complete agreement.  As a result, on this record, as Faulkner itself presses, there is no genuine issue of material fact with respect to whether the final Design Services Agreement is a completely integrated agreement.  The record establishes that it is.

Where it is applicable, "the parol evidence rule excludes extrinsic evidence that is solely offered for the purpose of varying, adding to, or subtracting from a written agreement." Kroblin v. RDR Motels, Inc., 347 N.W.2d 430, 433 (Iowa 1984); accord I.G.L. Racquet Club v. Midstates Builders, Inc., 323 N.W.2d 214, 216 (Iowa 1982); Montgomery Props. Corp., 305 N.W.2d at 476; Schnable v. Vaughn, 140 N.W.2d 168, 170 (Iowa 1966) (excepting "'fraud, accident, mistake or ambiguity parol evidence is not admissible to contradict, vary or enlarge the terms of a written contract'" (quoting Gordon v. Witthauer, 138 N.W.2d 918, 920 (Iowa 1966)); see Restatement (Second) of Contracts § 213(2) (previous agreements are discharged to the extent they are within the scope of the integrated agreement); see also Restatement (Second) of Contracts § 209 cmt. c ("To apply the rule of [section 213(2)] the court in addition to determining that there is an

integrated agreement and that it is completely integrated, must determine that the asserted prior agreement is within the scope of the integrated agreement.").  The reason for excluding such evidence "is that the parties have made their agreement, of which the written contract is evidence, and to permit additions or variances would be to change the terms of the agreement."  Gordon, 138 N.W.2d at 620; accord Weik v. Ace Rents, Inc., 87 N.W.2d 314, 516 (Iowa 1958) ("'The reason for the rule has been said to be that as the parties have made the writing the memorial of their understanding it constitutes the agreement as a matter of law and nothing may be added to it or substituted in its stead.'" (quoting City of Des Moines v. City of W. Des Moines, 56 N.W.2d 904, 906-07 (Iowa 1953)).

A corollary follows from the rule above:  extrinsic evidence "may be admissible to explain the real meaning of the parties by the language used in a contract," so long as it does not "vary, add to, or subtract from a written agreement."  Montgomery Props. Corp., 305 N.W.2d at 475-76; see also Hunter, 481 N.W.2d 514 ("[E]xtrinsic evidence that throws light on the situation of the parties is relevant to ascertaining the proper meaning of an agreement." (discussing Hamilton v. Wosepka, 154 N.W.2d 164, 168 (Iowa 1967))); Matherly v. Hanson, 359 N.W.2d 450, 459 (Iowa 1984) (5-4 decision) (Carter, J., dissenting) ("Yet, even an integrated agreement is subject to having its terms explained by parol evidence. . . .  Both the Restatement and our cases permit the use of parol evidence to establish the true meaning of an agreement." (citations omitted)); Kroblin, 347 N.W.2d at 433 ("[E]xtrinsic evidence is admissible as an aid to interpretation when it sheds light on the situation of the parties . . . and the objects they were striving to attain. . . .").  That is, while "[e]xtrinsic evidence offered to show 'what the parties meant to say' instead of 'what was meant by what they said' is not admissible . . . .", Bankers Trust Co. v. Woltz, 326 N.W.2d 274, 276 (Iowa 1982), evidence "concerned with interpreting the meaning of words actually used by the parties in the written agreement" is properly considered, id.; see also C-Thru Container Corp. v. Midland Mfg. Co., 533 N.W.2d 542, 544 (Iowa 2002) ("Under the

common law of Iowa, parol evidence is admissible to shed light on the parties' intentions but it may not be used to modify or add to the contract terms." (dicta)); accord Anderson v. Aspelmeier, Fisch, Power, Warner & Engberg, 461 N.W.2d 598, 600 (Iowa 1990); I.G.L. Racquet Club, 323 N.W.2d at 216; Hamilton, 154 N.W.2d at 168.

The analysis proceeds in two steps.  First, the Court must affix meaning to the terms used in the Design Services Agreement.  Second, the Court must determine whether extrinsic evidence should be excluded by the parol evidence rule.  See Salsbury v. Northwestern Bell Tel. Co., 221 N.W.2d 609, 611 (Iowa 1974) (explaining that "the [parol evidence] rule does not come into play until by interpretation the meaning of the writing is ascertained" (citing Egan v. Egan, 212 N.W.2d 461 (Iowa 1973)); accord I.G.L. Racquet Club, 323 N.W.2d at 216; Hamilton, 154 N.W.2d at 168.  This is a sensible test because the Court must decide what the terms of the agreement mean before ascertaining whether the proffered extrinsic evidence changes the meaning affixed.

### (1)  Interpretation of the Design Services Agreement.

When affixing meaning to the terms used in a contract, the Court must read the contract as a whole and not parse and then interpret individual provisions.  See Est. of Pearson ex. rel Latta v. Interstate Power & Light Co., 700 N.W.2d 333, 343 (Iowa 2005) (a contract is to be "construe[d] in its entirety by considering all of its pertinent terms"); Koenigs v. Mitchell County Bd. of Supervisors, 659 N.W.2d 589, 594 (Iowa 2003) (improper to "interpret [a] contractual term apart from the context of the agreement as a whole"); Smith Barney, Inc. v. Keeney, 570 N.W.2d 75, 78 (Iowa 1997) (stating the general rule that "[a] contract is to be interpreted as a whole, and it is assumed in the first instance that no part of it is superfluous").  Words, like phrases or terms, are to be interpreted in the context of the contract.  Hartig Drug v. Hartig, 602 N.W.2d 794, 798 (Iowa 1999).  A reading giving a "reasonable, lawful, and effective meaning to all terms is preferred to an interpretation that leaves a portion of the agreement of no

effect."  Smith Barney, Inc., 570 N.W.2d at 78; accord Est. of Pearson, 700 N.W.2d at 343; see also Am. Soil Processing, Inc. v. Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd., 586 N.W.2d 325, 334 (Iowa 1998) ("'Because an agreement is to be interpreted as a whole, it is assumed in the first instance that no part of it is superfluous; an interpretation that gives a reasonable, lawful, and effective meaning to all terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.'" (quoting Fashion Fabrics v. Retail Investors Corp., 266 N.W. 2d 22, 26 (Iowa 1978)).  As a result, the Design Services Agreement must be considered as a whole to ascertain whether Cole + Russell may seek payment from Faulkner before Faulkner receives payment from CHC or the City.

Cole + Russell opens by arguing that although the Design Services Agreement requires Faulkner to remit payment to Cole + Russell "within ten (10) calendar days of receipt of payment to the Construction Manager," this language does not create a condition precedent to payment but instead requires Faulkner to pay within a "reasonable" time period after Cole + Russell's performance.  Cole + Russell argues Faulkner's duty to pay exists regardless of whether Faulkner receives payment from the City or CHC.

Cole + Russell analogizes this situation to those where the payment of a debt is not required until the occurrence of a future event.  To support this effort, Cole + Russell relies extensively on Sanford v. Luce, 60 N.W.2d 885 (Iowa 1953).  There, the defendant and plaintiff entered into an oral agreement "practically equivalent to an agreement [where the defendant was required to pay] when she was able."  Id. at 886.  The court noted two ways to interpret such an agreement.  The then-"majority view" taught that a promise to pay when able was not an absolute promise but a conditional promise to pay; to succeed, the promisee must prove the promisor was able to pay.  Id. at 887.  The then-"minority view" proposed that when the promisor promised to pay when able, the payment must occur within a reasonable time.  Id. (discussing Mock v. Trustees of First Baptist Church, 67 S.W.2d 9, 11 (Ky. 1934)).

The difference between the two views hinged on the importance of the uncertainty of the future contingency.  The majority view treated the ability to pay as a valid condition precedent; the minority view viewed the condition as too uncertain and too indefinite to amount to a condition precedent.  Id.  The Supreme Court of Iowa noted that the majority view could require "the promise[e] to prove the happening of a contingency within the peculiar knowledge, if not even within the control, of the promisor."  Id.  As a result, that situation "create[d] uncertainty as to whether there really has been a binding promise to pay."  Id.  Conversely, the minority rule "would not endanger the integrity of the entire contract but would construe the condition as merely an arrangement that the maker (promisor) is not to pay immediately and may delay payment until a reasonable time has elapsed."  Id. at 887-88 (quotation marks omitted)).

The court adopted the minority rule where "the circumstances show the debt to be an absolute one."  Id. at 888.  Applied, the rule permitted the promisor to secure a reasonable time to pay but did not render the obligation to pay dependent upon the occurrence of a future contingency.  See id.; accord Dille v. Longwell, 176 N.W. 619, 621 (Iowa 1920).  Splicing together several terms of the Design Services Agreement shows, as Cole + Russell argues, that this case raises concerns similar to those addressed in Sanford.

As highlighted above, Article 6 opens with the nonpermissive directive that "[Faulkner] shall compensate the Architect for all services provided to the Project by Architect and its Consultants."  This language has two implications.  First, this clause supports Cole + Russell's argument that it did not intend to "gift" its services.  Second, this clause makes unambiguous that the duty to pay Cole + Russell is solely upon Faulkner.  Paragraphs 6.1.A, 6.2.3, and 6.3.2 are in accord, providing that Cole + Russell's compensation for basic and additional services "shall be paid monthly."  Section 7.2 contains similar language.  Reading these clauses in conjunction with the introductory clause to Article 6 requires Faulkner to make payments monthly to Cole +

Russell.  These monthly payments are not conditional upon Faulkner's receipt of payment from either CHC or the City.

Faulkner relies primarily on sections 6.4.1 and 7.7.  Section 6.4.1 actually harms Faulkner's position.  Recalling, section 6.4.1 provides that Cole + Russell "understands" certain features about CHC's payment cycles and then sets forth an interest rate applicable to past due payments.  Specifically, section 6.4.1 requires that "[a]mounts unpaid for ten (10) calendars [sic] days after [CHC]'s payment cycle (therefore, <u>Architect will be paid within 45 to 75 days from [Faulkner]'s receipt of Architects [sic] invoices</u>) shall bear interest at" a predetermined rate. While perhaps inartfully drafted, this clause does not place a condition on Faulkner's duty to pay.  Section 6.4.1 only requires that payments be made within a certain time period after the close of CHC's payment cycle, and if such payments are not made, they accrue interest.  In fact, this section mandates that Cole + Russell "<u>will</u> be paid within 45 to 75 days from Faulkner's receipt of <u>[Cole + Russell's] invoices</u>" even if payment from the City or CHC is late.  Payment from CHC or the City is therefore not a prerequisite to Faulkner's duty to pay.

Faulkner must then rely on section 7.7, which reads that Faulkner "shall make payment of all undisputed amounts due to [Cole + Russell] within ten (10) calendar days of receipt of payment to [Faulkner] as provided in 6.4.1."  This term cannot serve as a condition precedent to Faulkner's duty to pay Cole + Russell for two independent reasons.  First, section 6.4.1 establishes a rate of interest for those payments unpaid ten days after the close of CHC's payment cycle, and not the generic monthly payments Faulkner was required to make under, for example, sections 6.1.A, 6.2.3, 6.3.2, and 7.2.  Because section 7.7 refers only to payments made under section 6.4.1, section 7.7 addresses only those payments CHC actually made to Faulkner but which remained unpaid by Faulkner to Cole + Russell within ten days after the close of CHC's payment cycle.  Second, if the Court interpreted section 7.7 as Faulkner wished, that section would require <u>all</u> payments to be made to Cole + Russell within ten days after receipt from CHC.

27

This reading would render superfluous language in sections 6.1.A, 6.2.3, 6.3.2, and 7.2 requiring monthly payments.  Recalling that the Court cannot interpret a contract such that terms are rendered superfluous, the narrower reading of section 7.7 is necessary.

Finally, permitting Faulkner to absorb the benefit of services provided by Cole + Russell, even if Faulkner passed that benefit on to the City and CHC, would offend principles espoused in Sanford.  There, as here, the debt owed to Cole + Russell is absolute.  Sanford, 60 N.W.2d at 888.  As noted above, the Design Services Agreement provides multiple times that Faulkner "shall" pay Cole + Russell certain amounts.  In such situations, the promisor is only permitted a "reasonable time" to make payment, regardless of whether the anticipated event occurs.

The Court concludes the Design Services Agreement requires Faulkner to pay invoices demanded by Cole + Russell within a "reasonable time," regardless of whether Faulkner receives payment from CHC or the City.  It follows that Faulkner's argument that it need not pay Cole + Russell until CHC or the City pays Faulkner is faulty.

## (2)  Parol Evidence Considerations.

Now that a meaning has been affixed to the relevant terms of the Design Services Agreement, the analysis returns to evidence extrinsic from the contract the parties seek to include.  Two pieces of evidence are submitted:  the Letter Agreement and Gallup's testimony.

### (a)  Propriety of Including the Letter Agreement.

As noted above, Faulkner has agreed to be bound by the final Design Services Agreement.  The Letter Agreement antecedes the final Design Services Agreement.

The clause in the Letter Agreement Faulkner wishes to include provides that "[p]rogress billings may be invoiced monthly and shall be due within thirty (30) days subject to receipt of payment from [CHC]."  Faulkner interprets this phrase to establish that its payments to Cole + Russell are due no more than thirty days after Cole + Russell's invoice is received as long as CHC pays Faulkner.

28

The payment of invoices by Cole + Russell is well within the scope of Article 6 of the Design Services Agreement, and the Letter Agreement does nothing to explain the meaning of the language used in the Design Services Agreement.  Because the Design Services Agreement should be interpreted to remove any condition to Faulkner's duty to pay Cole + Russell, the interpretation of the Letter Agreement urged by Faulkner contains different terms.  Therefore, the Court will not consider this term of the Letter Agreement pursuant to the parol evidence rule. The term providing that payment from Faulkner to Cole + Russell is "subject to receipt of payment from [CHC]" is therefore without effect.

### (b)  Propriety of Including Gallup's Testimony.

A different conclusion is required with respect to Gallup's testimony.  As explained above, the Court may consider extrinsic evidence to explain the meaning of the parties by the language used in a contract.  While Gallup's testimony references the Letter Agreement, he does not refer to the status of the agreement as described in the Letter Agreement but instead describes the status of the agreement between parties at the time of the Letter Agreement.  The following excerpt is illustrative:

> Q:     . . . [O]utside the confines of [the Letter Agreement] . . .did you ever
> have any understanding with Cole + Russell in which you said, look we've
> agreed to pay you $2,726,012 . . . [but i]f the City or [CHC] won't agree to
> pay us that amount, but will only agree to pay $2,200,000, you're at risk for
> the difference?
> A:     I didn't have that conversation because at the time I sent them [the
> Letter Agreement] I didn't think that that discrepancy was at issue.
> Q:     So that wasn't part of the agreement when you sent the [Letter
> Agreement], was it?
> A:     No.  No.

Gallup Dep. 137:15-138:7.  Gallup does not say the Letter Agreement itself addressed a potential risk for payments remaining outstanding if the City or CHC chose not to reimburse Faulkner for the full amount of Cole + Russell's services, he states that at the time the Letter Agreement was executed, that issue was not addressed in the parties' agreement.  And because the parties have

agreed, for the purposes of this motion, that the draft Design Services Agreement (under which Cole + Russell was authorized to do work) and the final Design Services Agreement (to which Faulkner has agreed to be bound) are identical, Gallup's observation that there was no agreement between the parties assigning the risk for underpayment by the City or CHC is admissible.  This testimony is "concerned with interpreting the meaning of the words actually used by the parties in the written agreement."  Bankers Trust Co., 326 N.W.2d at 276.

Gallup's testimony shows that if a discrepancy arose between the amount Cole + Russell billed Faulkner and the amount CHC or the City submitted to Faulkner to compensate Faulkner for Cole + Russell's services, no provision in the Design Services Agreement gave Faulkner the ability to excuse its continuing obligation to remit payments to Cole + Russell.

This analysis merely reinforces the conclusion reached above.

### b.    Conclusion.

Faulkner's Motion for Summary Judgment must be **denied** as to Count I of Cole + Russell's First Amended Complaint.  As noted above, Faulkner claims that because Count I fails, Counts II and III fail because they employ general incorporation paragraphs.  The Court need not consider the validity of this position because Count I does not fail in the manner Faulkner argues.

### B.    Faulkner's Motion for Summary Judgment on Claims Advanced by the City and CHC.

Faulkner has moved for summary judgment against the City and CHC on two separate grounds.[8]  First, Faulkner argues CHC and the City are bound by the Preconstruction Services Agreement to pay the amounts Cole + Russell is demanding from Faulkner.  Resisting, the City and CHC argue that because Faulkner represented the Project was on budget, when in fact it was

---

[8] Complicating matters has been Faulkner's failure to identify the claim or claims upon which it seeks summary judgment.  But see LR 56.1(a)(1) (requiring parties moving for summary judgment to state "each of the grounds for the motion").  The nature of the argument presented in Faulkner's filings suggests it believes summary judgment is appropriate on the claims brought by CHC and the City.

not, the City and CHC have been relieved of paying fees claimed by Cole + Russell exceeding the amount budgeted for those expenses.  Second, Faulkner claims the City and CHC are pre-vented by the Preconstruction Services Agreement from seeking monetary damages from Faulkner.  Responding, the City and CHC argue that if they succeed on their rescission claim, the terms in the Preconstruction Services Agreement limiting recoverable damages disappear. The City and CHC also argue their other claims are not grounded in the Preconstruction Services Agreement, so terms limiting damages arising from that agreement are inapplicable.

      **1.   Material Facts.**

On November 26, 2002, Faulkner's predecessor presented Boyd and CHC with a pre-liminary budget for the Project.  The budget included "project planning, design, engineering, building and site construction, and equipment, furnishing, and fixtures" for a 250-room Marriott hotel, exhibition and meeting space, a restaurant, and other amenities.  Coralville Parties App. 370.  Based on "criteria provided and developed to date, preliminary quantity and cost surveys, and other considered reasonable assumptions," Faulkner's predecessor provided a total Project budget of $57,014,237.  Coralville Parties App. 370, 377.  Gallup drafted this budget based on basic drawings prepared by Cole + Russell.

In March 2003, CHC and Faulkner executed the Memorandum of Understanding.  The Memorandum of Understanding memorialized certain agreements while CHC and Faulkner negotiated other aspects of the Project to be resolved in documents called Definitive Agree-ments.  Pursuant to the Memorandum of Understanding, the preliminary budget was $57,014,237 – the same as the November 26, 2002, letter.  The parties agreed that a Guaranteed Minimum Price would be set within sixty days within execution of the Memorandum of Understanding and would not exceed a 5 percent variance of the preliminary budget.  If a Guaranteed Maximum Price could not be developed within those parameters, the Memorandum of Understanding

permitted the City and CHC "to terminate negotiations of such Definitive Agreements and to select another party to design, construct and develop the Project." Mem. of Understanding ¶ 3.

In April and March of 2003, Cole + Russell prepared a set of plans and specifications known as the Hospitality Design Review Plans (the "HDR Plans"). While the HDR plans provided little information to a layperson, Faulkner was "able to do quite a bit with this level of document" in terms of projecting a budget. Gallup Dep. 328:11-19. In September 2003, Cole + Russell prepared a group of documents known as Bid Package A. The schematic designs included with Bid Package A gave "significantly" more detail to aid in the creation of accurate budgets than schematic drawings used previously. Gallup Dep. 330:7-11.

In late 2003, the City paid Cole + Russell for all work it had performed directly for CHC. After this point in time, all work Cole + Russell performed was pursuant to agreements with Faulkner. Boyd testified that the City was pleased with Cole + Russell's work; in fact, "[d]uring the first quarter of [20]04, there was contemplated [sic] that [CHC] might have to contract directly with an architect to develop plans and specs . . . [b]ut at no time did [CHC] ever enter into an agreement to do that." Boyd Dep. 43:16-24, Feb. 27, 2006.

On April 13, 2004, CHC and Faulkner executed the Preconstruction Services Agreement. The recitals define the Preconstruction Work Faulkner was to perform as the Project's Construction Manager. Section 1 permits changes in the scope of work performed under the agreement, as follows:

> (a)    [CHC] may at any time, by written notice to [Faulkner] and in accordance with the provisions of this Section 1, alter or enlarge the work to be performed by [Faulkner].
> (b)    Any change to the project description, scope of work and/or master program schedule that results in additional work and/or cost to [Faulkner] may be the basis of a Preconstruction Services Change Order as provided for in this Agreement, except where such extra work or cost is made necessary by actions or omissions of [Faulkner], its agents or trade contractors.
> (c)    All changes to the scope of the Project must be in writing from [CHC], through the vehicle of a change order entitled Preconstruction Services Change Order. When fully executed by [CHC] and [Faulkner], such a

Preconstruction Services Change Order shall become an integral part of
this Agreement.
. . . .
(e)    By approving and returning to [Faulkner] a fully executed Precon-
struction Services Change Order, [CHC] gives notice-to-proceed to
[Faulkner] for the change in scope as defined in the Preconstruction Ser-
vices Change Order. [CHC] is not responsible for payment to [Faulkner] for
any changes to the scope of the Preconstruction Work, and [Faulkner] is not
responsible for performing any work outside the scope of the Preconstruc-
tion Work, unless a previously authorized Preconstruction Services Change
Order has been executed by both parties prior to commencement of the
additional work.

Preconstruction Services Agreement § 1.  Two sections address fees to which Faulkner would be

entitled.  Section 2 states, in relevant part,

The parties anticipate that the Construction Manager Agreement will pro-
vide that the fees to be charged by [Faulkner] in connection with acting as
Construction Manager for the Project shall be calculated as follows:  an
amount not to exceed 5.00% of the Project Costs not including the Con-
struction Managers [sic] Fees, for its Construction Management fee, plus an
amount not to exceed 1.00% of the Project Costs not including the Con-
struction Managers [sic] Fees, for compensation for taking the construction
risks described in [the] Agreement, plus a fixed amount of $950,000 for its
fees as developer ("Development Fee") for Preconstruction Work as
follows:  50% shall be billed under this Agreement for Preconstruction
Work and[] the balance shall be due as lump sum [sic] at the closing of the
Bond Financing.

Preconstruction Services Agreement § 2 (emphasis added).  The language of section 2 primarily

relates to fees to which Faulkner would be entitled under a to-be-drafted Construction Manager

Agreement.  Section 3 contains fees Faulkner could charge for work performed under the

Preconstruction Services Agreement, as follows:

The fees to be charged by [Faulkner] in connection with this Agreement
shall be calculated as follows: $475,000 for the Preconstruction Work (all of
which shall be credited toward the first 50% of the Development Fee), plus
the direct cost of any related expenses of [Faulkner] in connection with per-
formance of the Preconstruction Work. . . .   All additional work authorized
by [CHC] pursuant to a Preconstruction Services Change Order in accor-
dance with Section 1 of this Agreement shall be performed upon the terms
set forth in such Preconstruction Services Change Order.

Preconstruction Services Agreement § 3 (emphasis added).  Part of the present dispute is whether the emphasized portion requires CHC to reimburse Faulkner for fees paid to Cole + Russell.

Section 7 lists a preliminary budget figure for the Project of $60,213,000 and contemplates a final Project budget would be developed within thirty days after completion of bidding for the General Contract that would not exceed the preliminary amount plus a 5 percent variance. Section 7 provides further that if the final budget fell outside the variance, CHC or the City could terminate the agreement.  A cost breakdown attached to the Preconstruction Services Agreement as Exhibit A budgets $2,242,000 for architectural and engineering fees.

Section 13(o) contains terms purportedly limiting the liability of the signatories:

> (o)   EXCEPT FOR PERSONAL INJURY OR PROPERTY DAMAGE, PRIOR TO THE COMPLETION OF THE DEFINITIVE AGREEMENTS, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTIES FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES (EVEN IF THAT PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES) ARISING FROM THIS AGREEMENT, SUCH AS, BUT NOT LIMITED TO, LOSS OF REVENUE OR ANTICIPATED PROFITS OR LOST BUSINESS.

Preconstruction Services Agreement § 13(o).[9]

Section 13(i) permits termination of the agreement for an array of reasons.  Section 13(i)(iii) sets forth events allowing CHC to terminate the agreement for cause.  The events listed are Faulkner's failure to diligently and timely complete work; failure to maintain insurance; a material breach of the Preconstruction Services Agreement or other agreement between Faulkner and CHC; and claims made by others for unpaid services, labor and materials under the Preconstruction Services Agreement.  If the Preconstruction Services Agreement is terminated for

---

[9] The term "definitive agreements" is defined in the Memorandum of Understanding but not in the Preconstruction Services Agreement.  Context suggests the "definitive agreements" are agreements contemplated by the recitals of the Preconstruction Services Agreement that would exist following continuing negotiations between CHC and Faulkner.  See Preconstruction Services Agreement, at 1-2.

cause, section 13(i)(iv) provides that Faulkner "shall not be entitled to receive further payment until the Preconstruction Work is completed, if completed by others," and "[i]n addition, [CHC] shall be entitled to any and all remedies provided by law."  CHC and the City argue section 13(o), read in conjunction with section 13(i), permits CHC to recover "any and all remedies provided by law," thus removing any limits imposed by section 13(o).

Representatives of Faulkner had frequent and regular meetings with the representatives of the City and CHC, indicated that plans were proceeding satisfactorily, and that all budget estimates were realistic.  Despite making these representations, the record shows the budget figures listed in the Preconstruction Services Agreement were prepared by Gallup during the summer of 2003, and therefore did not reflect the most recent figures.  In fact, Gallup conceded he did not review plans prepared by Cole + Russell in any great detail before submitting the budget in the Preconstruction Services Agreement:

> Q:   Well, there were plans and specifications prepared for bid package A after your initial budgets, correct?
> A:   That's correct.
> Q:   And then there were 30 percent plans prepared, correct?
> A:   Yes, there were.
> Q:   And then there were 70 percent plans prepared, correct?
> A:   Yes.
> Q:   To find out if they reflected the budget, you would have to review the plans and specifications in detail, wouldn't you?
> A:   Yes, you would.
> Q:   You didn't review the plans and specifications in detail before you gave the City this budget in April of 2004, did you?
> A:   No, I did not.

Gallup Dep. 401:9-402:1.  Gallup further testified that he never reviewed the 30 percent construction drawings.  Representatives from Marriott, however, reviewed the drawings and provided feedback.  When Mark Bischoff, a Cole + Russell architect, inquired as to why he received no feedback from Faulkner on the 30 percent construction drawings, Farrell, a Faulkner employee, explained that he "wouldn't even typically look at the drawings until 70 percent."  Bischoff Dep. 173:25-174:2, Apr. 11, 2006.  This conduct was atypical to Bischoff.

Despite unfamiliarity with certain of Cole + Russell's drawings, Faulkner continued to submit Project budgets. The first was submitted on August 5, 2004. On that date, Farrell indicated the budget had increased to $63,009,688 "due to steel price escalation." Coralville Parties App. 409-410. At his deposition, Farrell testified he arrived at the $63 million figure by taking a previous budget and adding 2.5 percent to reflect an increase in steel costs:

> Q:   . . . . What did you do to come up with this budget in August of 2004? Did you just apply a price escalation factor to the steel –
> A:   Yes.
> Q:   – to an earlier budget?
> A:   Oh, I'm sorry. Yes.
> Q:   Did you do anything else?
> A:   I don't remember.
> Q:   And that's my question. Did you do new quantity takeoffs or new price testing or anything or did you just at that point in time use the old budget and add the steel price escalation factor?
> A:   I believe we just used the old budget with the price escalation factor.
> Q:   Okay. And that old budget, you don't know who prepared it or when?
> A:   No, sir.
> Q:   Do you know if it was accurate?
> A:   No, sir.

Farrell Dep. 175:14-176:7, Mar. 29, 2006. On August 13, 2004, Farrell submitted another budget, which was purportedly based on the 30 percent drawings. The estimated Project budget was $62,108,262.

Cole + Russell completed the 70 percent drawings on August 27, 2004. Gallup admits he did not review these documents to "any great degree." Gallup Dep. 335:14-18. Despite apparent unfamiliarity with plans produced by Cole + Russell that were supposed to guide budget projections, Gallup prepared another Project budget on September 16, 2004.

By this time, the Project budget had ballooned to $70,748,281. The budget had increased because of additional parking added at a cost of around $13-million. The cost of conference center and hotel, which had increased in size from 250 to 286 rooms, was estimated at $57,685,842. Bischoff testified that Cole + Russell continually asked for cost guidance from

36

Faulkner on the design throughout this process but was summarily told the design was within the budget.

Gallup submitted another budget on approximately October 18, 2004. This budget projected a total cost of $70,748,281. Farrell, who was at this point in charge of preparing and submitting budgets, testified that he was unsure how Gallup had generated this budget:

> Q:    So are you telling me that although you were supposed to be preparing the budgets, Bob Gallup was doing the work?
> A:    Bob Gallup was doing the work for the budgets, yes, sir.
> . . . .
> Q:    Did you – and when you made all these computations about what it was going to cost to build this building, these were all on your detailed Excel spreadsheets?
> A:    Yes, sir.
> Q:    Did you ever send that detailed Excel spreadsheet to Bob Gallup?
> A:    I don't remember.
> Q:    Do you know if – well, do you know where Bob Gallup came up with the numbers for [the October 18, 2004 budget]?
> A:    No, sir. I would imagine his experience.

Farrell Dep. 233:22-235:3.

By November 16, 2004, Faulkner had prepared still another updated budget. Gallup testified that he "assume[d this budget] would have been prepared by Patrick Farrell." Gallup Dep. 423:6-8. (Farrell, however, testified that he did not prepare that particular budget, was not familiar with it, and had not verified its accuracy.) In e-mail text accompanying the budget, Gallup stated his intention was to forward the November 16 budget to Boyd with the estimate that bids for constructing the hotel and conference center only would be $36,947,748. However, on November 19, 2004, just before the public bids were opened, Faulkner provided a budget indicating anticipated bids for the hotel and conference center would be $36,737,748. No explanation is offered for the discrepancy.

Farrell testified that on November 19, 2003 – the day public bids were received on the hotel and conference center portion of the Project – he had not completed a detailed budget:

Q:     . . . . Do you see the e-mail from Bill Boyd in the lower half of the page to you on December 9, 2004?

A:     Yes.

Q:     And he asks if you can give him an estimated time of arrival on the detailed budget estimate prepared by Faulkner for [the] November 19th bid letting.  Do you see that?

A:     Yes.

Q:     Did you know what he was asking for?

A:     Yes.

Q:     Tell me what you understood him to be asking for.

A:     I – a detailed budget estimate.  A detailed estimate showing what all numbers were and with quantities or times or hours or that kind of thing.

Q:     You told me you had an Excel spreadsheet with a complete budget estimate on your computer at the time.

A:     Yes, sir.

Q:     You had it on your computer at the time you got this e-mail, didn't you?

A:     Yes, sir.

Q:     Did you send that to Bill Boyd?

A:     No, sir.

Q:     Why not?

A:     I hadn't completed certain aspects of it from the bid.  I was still going through the bid documents days after to see what I did not have in there, and I blew the time I told him – I blew the time I told him I was going to get him these things after more and more research into the drawings.

Q:     When you say you were completing it after the bids came in, I want to make sure I understand that.   Are you telling me that your detailed bid estimate prior to November 19th was not complete?

A:     That's correct.

Q:     You had some gaps in there?

A:     Yes, sir.

Q:     Some areas where you simply had not made an estimate?

A:     Yes, sir.

Farrell Dep. 331:16-333:7; see also Coralville Parties App. 452-453.  Farrell estimated that

between 5 and 10 percent of the budget had not been estimated.  Farrell did not tell the City or

CHC this had not been completed because "[n]obody asked."  Farrell Dep. 334:3-9.

On November 19, 2004, public bids were accepted from three general contractors to

construct the hotel and conference center portion of the Project.  As noted, Faulkner's budget

was just over $36-million for that portion of the Project.  The bids ranged between $50,570,000

and $53,650,000.  Gallup expressed shock at the bids, stating that in his "wildest dreams," he did

not believe bids would exceed $40-million.  Gallup Dep. 457:22-458:13.  Farrell expressed

similar surprise.

Much is made of Faulkner's understanding of its duty to provide accurate budget

estimates.  Boyd testified that Faulkner repeatedly assured the City and CHC preceding the bid

letting that the Project was within projected budgets:

> A:    They had assured us throughout the months preceding [sic] up to
> November 16th, even in the days before the November 16th, bid letting, that
> they would be at 5 – plus or minus 5 percent of the budget amount that we
> had, as a result we were substantially over.

Boyd Dep 45:25-46:5.  Farrell agreed that Faulkner had represented the Project was within

budgets Faulkner provided:

> Q:    . . . . Did you say all along that your budget was enough for the City
> to build the hotel as shown in the plans and specifications?
> A:    With the information that I had from subcontractors and whatever I
> knew, yes, I believe that.
> Q:    What's [sic] what you told the City and CHC?
> A:    Yes, sir.

Farrell Dep. 358:11-18.  However, Farrell agreed that "if [he] had to do over again and if [he]

had been in on [the P]roject from the beginning, [he]'d have made it clear if the City or CHC

wanted changes that exceeded the budget, [he]'d have made it clear to them that that was going

to cost them more money and that they either had to pay more or they couldn't make the

change."  Farrell Dep. 368:20-369:4.

Gallup also believed Faulkner had a duty to be candid when communicating with the City

and CHC:

> Q:    [After April of 2004] you still were in a position to monitor the design
> of the project to bring it within budget, weren't you?
> A:    Yes.
> Q:    And it was your job to try to design a hotel within the City's budget so
> that when the public bids were made, those bids would come in at or below
> your budget, correct?
> A:    Yes, I believe so.

> Q:    And you never told the people at the City you couldn't do that just because there was going to be public bidding, did you?
> A:    No.  No.  Did not.
> Q:    Now, even before you signed these letter agreement and memorandum [sic] that we've talked about in November of 2002, March of 2003 and April of 2004, did you feel that you had an obligation to be candid when you dealt with people at the City and CHC?
> A:    Yes, I did.
> Q:    Did you feel that you had an obligation to give them accurate budget predictions to the best of your ability even before you signed these agreements?
> A:    Yes, I did.

Gallup Dep. 357:9-358:6.  Gallup had much to say about Faulkner's duty to monitor the

Project's budget:

> Q:    Sir, I want to ask you how you viewed your role before the City[] and [CHC] in view of your role in the design and construction industry.  Did you understand that the City and CHC were relying upon Faulkner for their expertise in designing and building hotels?
> A:    I did.
> Q:    And did they – did you understand that the City and CHC were relying on you and Faulkner to control the budget?
> A:    Yes.
> Q:    Did you understand that the City and CHC were relying on you and Faulkner to oversee the design of this project to make sure that it came within the budget?
> A:    Yes.
> Q:    Did you understand that the City and CHC did not have the same level of expertise that you and Faulkner did in designing and constructing hotels?
> A:    Yes.
> Q:    Did you understand that you had an obligation to be honest and candid with the people from the City and CHC at all times?
> A:    I did, yes.
> Q:    And if you found cost savings that could benefit the City or CHC, did you believe you had an obligation to disclose that information to the City and CHC?
> A:    Yes, I did.
> Q:    And if you saw that the design of the hotel and conference center was going over the budget, did you believe you had an obligation to tell the City and CHC as soon as you knew that?
> A:    Yes, I did.
> Q;    Did you believe you had a duty to monitor the plans and specifications to make sure that the design of the project was within the budget?
> A:    Yes, I did.

> Q:    And did you believe that all of the employees at Faulkner that you
> relied on had that same duty?
> A:    I believe so, yes.
> Q:    If the design changed, did you believe that you and other employees at
> Faulkner had an obligation to review those plans and specifications to see if
> the changes affected the budget?
> A:    Yes.
> Q:    And if the plans and specifications changed and you did not have
> enough time to review them to see what effect they would have on the
> budget, did you believe you had an obligation to tell the City you needed
> more time?
> A:    Yes, I did.  Yes, I would.

Gallup Dep. 346:18-348:20.  Gallup understood that control of the budget did not rest with Cole

+ Russell.

Mark Schultz, Faulkner's president, testified that he understood CHC and the City relied

upon Faulkner to guarantee the Project stayed within acceptable budget parameters.  To achieve

the goal of budget control, Schultz testified it was necessary to continuously provide cost direc-

tion to clients by way of "identify[ing] systems and methodologies to use to keep a project in

budget."  Schultz Dep. 136:11-137:15, Mar. 2, 2006.  The overarching purpose was "[t]o control

the budget, to make sure that the design matches the budget, to make sure that the – that the

quality level matches the budget . . . ."  Schultz Dep. 138:5-9.  Gallup confirmed this position:

> Q:    Any time the plans and specifications were changed did you or the
> other people at Faulkner review those plans and specifications to see what
> impact it would have on a budget?
> A:    I believe to the best of our ability we did.
> Q:    That was your job, wasn't it?
> A:    Yes.
> . . . .
> Q:    . . . .  Every time the plans and specifications progressed from
> schematic drawings to 30 percent to 70 percent to 100 percent, they
> provided more detail for the purposes of estimating the budget, correct?
> A:    That's correct.
> Q:    Did you expect yourself and the people working for you to review the
> plans and specifications in detail to make sure they understood what impact
> that would have on the budget?
> A:    Yes.

> Q:    And it was fair for the people at the City[] and [CHC] to expect
> Faulkner to do that, wasn't it?
> A:    Yes, it was.
> Q:    That was your job?
> A:    Yes, it was.  And I was getting feedback on that as that was going on.

Gallup Dep. 324:11-17; 338:18-339:9; see also Gallup Dep. 401:9-22.  Gallup also understood

that part of Faulkner's budget-monitoring responsibilities included watching for price increases

and calculating those increases into budgets submitted to CHC and the City.  However,

Hayworth testified that Faulkner "deceive[d]" the City by representing Faulkner was testing the

budget with specific numbers provided by contractors when such tests had not occurred.

Hayworth Dep. 130:6-21.

 The parties also dispute the familiarity of Farrell and Gallup with documents upon which

they relied when preparing budgets.  CHC and the City point out Farrell was questioned

extensively about his review of the 70 percent plans.  Farrell testified that he thoroughly

reviewed some portions of the 70 percent plans, but other portions received only a cursory

review.  Farrell acknowledged that to conduct accurate quantity takeoffs and pricing, it was

essential to thoroughly review every aspect of the architectural drawings, a step he did not do.

The 100 percent, or final, plans, received similar treatment.  He added that part of his job was to

provide prices for telecommunications for detailed budget estimates, but that he failed to look at

telecommunications plans when preparing budget estimates.

 Farrell was questioned extensively about the mechanical, electrical, and plumbing com-

ponents of the Project.  Mechanical, electrical, and plumbing costs are a significant portion of

construction projects and can typically account for between 25 percent and 40 percent of the

total costs for a project.  Farrell testified he was not familiar with those plans because he gave

them a cursory review.  Farrell Dep. 239:22-24 ("I wasn't that familiar with the [mechanical,

electrical, and plumbing plans] or specifications, just had a general overview of it.").  While

Farrell looked to mechanical, electrical, and plumbing subcontractors for guidance, he

understood he was attempting to obtain prices in an area with which he was not familiar enough

to do an adequate job:

> Q:    So on about 25 percent of the budget you were trying to get prices in
> an area that you had no familiarity with, correct?
> A:    That's correct.  Although I wouldn't use the word no familiarity.
> Q:    Not enough to do a good job?
> A:    Not enough to do a good job.

Farrell Dep. 242:13-19.  Faulkner's estimate for mechanical, electrical, and plumbing costs on

the Project was approximately $9.2-million.  The low bid for that portion of the Project was

$12.7-million.

Discrepancies arose in other areas as well.  For example, Faulkner budgeted approxi-

mately $2.2-million for metals; the low bid exceeded $3.9 million.   Farrell explained

the mismatch as follows:

> Q:    . . . .  This structural steel, I think your budget estimate for all the
> metals was 2.2-million and the bid came in at 3.9-million, correct?
> A:    Correct.
> Q:    Do you know why that happened?
> A:    Well, one of those things I believe is the WAG on the joist, on the big
> bolstering trusses.
> Q:    The wild-assed guess?
> A:    Yes, sir.
> Q:    All right.  So basically your estimate was just off on that then?
> A:    I believe so, yes.

Farrell Dep. 310:13-24.

The City and CHC also argue Gallup was not familiar with the design documents.

Bischoff recalled a September 2004 conversation with Gallup where Gallup referenced barreled

roofs he believed had "recently" appeared.  Bischoff testified this component was visible in

drawings made as early as April 2003, nearly one and one-half years earlier.

A short time after the receipt of bids, on December 3, 2004, Cole + Russell wrote to

Boyd to propose alternative methods of proceeding with the Project.  Cole + Russell proposed it

remain a design partner and work with the City and a third party to develop revised documents.

Cole + Russell recommended the City "remit all accounts receivable for work performed to date to [Faulkner to] allow [Faulkner] to assign ownership of all deliverables furnished to [Faulkner] by the Architect, to the ownership of the City."  Faulkner App. 119.

As noted above, on December 9, Boyd asked Farrell for a detailed budget estimate that was to have been prepared before the November 19 bid letting.  Farrell responded that he would have the estimate that afternoon.  Boyd requested the estimate again on December 13, 2004, because Farrell had not responded.  Farrell admitted he had not prepared a detailed budget by December 14 – twenty-five days after the bids – because he was "still reviewing the plans."  Farrell Dep. 344:8-13.  Boyd requested the budget yet again on December 22, 2004.  Gallup forwarded a detailed budget on December 23, 2004.

On December 15, 2004, Fausett, acting on behalf of the City and CHC, terminated the Preconstruction Services Agreement.  Fausett did not specify whether termination occurred pursuant to section 7 or section 13(i) of the Preconstruction Services Agreement.  In Fausett's letter, CHC and the City demanded Faulkner deliver all plans and specifications prepared by Cole + Russell.  The City and CHC also asserted they would not pay for additional services rendered by Cole + Russell because CHC and the City had already "paid, either to Faulkner or directly to [Cole + Russell], the full amount contracted and budgeted . . . for services performed to date by [Cole + Russell]" as set forth in Exhibit A to the Preconstruction Services Agreement.  Faulkner App. 89-90.

On December 16, 2004, Gallup responded to Fausett's letter.  Gallup explained Faulkner's belief that invoices from Cole + Russell were reimbursable under paragraph 3 of the Preconstruction Services Agreement.  According to Faulkner, paragraph 3 required CHC to pay for direct costs and expenses Faulkner incurred in an amount not limited by any particular budget.  As a result, Faulkner believed the agreement required the City and CHC to pay all of Cole + Russell's fees associated with the Project.  Faulkner further disagreed with CHC's

position that no increases to the amount budgeted for architectural expenses had occurred because "the provisions of Paragraph 1, sited [sic] by you, pertain to changes directed by [CHC] that effect [sic] our fees and not those to be reimbursed as direct costs." Faulkner App. 121.

According to CHC and the City, because the Project so drastically exceeded planned budgets, the plans and specifications developed by Faulkner and Cole + Russell could not be used. After public bids came in, the parties attempted to "value engineer" the Project by modifying the plans and specifications, but those attempts were futile. Farrell recalled,

> Q:   [W]hen you were involved in these value engineering efforts after the bids, did it become clear to you that you could not build this hotel with the existing plans and specifications for the budget you had given the City?
> A:   Oh yes, yes.
> Q:   That was obvious?
> A:   Yes, that was obvious.

Farrell Dep. 362:13-20. The City and CHC claim that they were forced to start over with a new architect and contractor.

The City and CHC have not paid Faulkner for fees to which Cole + Russell claims it is entitled from Faulkner, alleging they have paid Faulkner for all architectural fees they are obligated to pay. Further, the City and CHC argue, the services performed by Cole + Russell serving as the basis for its claim against Faulkner were performed pursuant to the Letter Agreement or the Design Services Agreement, not under an agreement between Cole + Russell and the City or CHC.

The architectural fees the City and CHC claim they have paid are those listed in Exhibit A to the Preconstruction Services Agreement. That document permitted architectural and design fees in the amount of $2,242,000; CHC and the City claim that number never increased. To support this conclusion, the City and CHC rely on documentary and testimonial evidence. First, the City and CHC point out that section 1 of the Preconstruction Services Agreement required executed Preconstruction Services Change Orders to authorize additional fees. Because no orders were executed, no increases to the amount listed in Exhibit A were authorized. CHC and

45

the City note that while section 3 of the Preconstruction Services Agreement requires the City to reimburse Faulkner for all out of pocket expenses, they argue section 5, alone, governs reimbursement for architectural fees.  Second, the City and CHC argue Faulkner communicated no anticipated increases in architectural or engineering fees in budgets submitted before letting bids.  Hayworth testified as follows:

> Q:     And I take it it's the City's position that they only authorized 2.2-million approximately?
> A:     Correct.
> Q:     And what's that based upon?
> A:     That was our agreement with FaulknerUSA and we–every budget that we received from Faulkner also verified that amount was included as the architect's fees.
> Q:     And you say that was your agreement.  Are you referring to the preconstruction services agreement in April of 2004?
> . . . .
> A:     I believe – yes.

Hayworth Dep. 108:8-23.  Additionally, Gallup testified that upon signing the Preconstruction Services Agreement, he was aware of "an issue that there may be some disparity between what the architect's fees were going to be" but had not had time to investigate the problem.  Gallup Dep. 398:9-15.  Still, exhibits to Gallup's deposition show progressive budgets maintained approximately consistent estimates for architectural fees.  See Coralville Parties App. 414 (September 30, 2004, budget reflecting an amount of $2,324,032 for "Design Fees"); 417 (October 18, 2004, budget reflecting a "Commitment Amount" budgeted for "Architectural Consultants" for the hotel and conference center (excluding an expensive underground garage) of $2,324,032); 423 (November 16, 2004, budget listing $2,324,032 budgeted for "Architectural Consultants – Hotel").  Gallup testified estimates for architectural fees that failed to include the $677,213.79 Cole + Russell now seeks from Faulkner was an "error":

> Q:     . . . .  [I]n terms of written representations to the City about the architectural fees that you were putting in their budget as of September 16, 2004, that number had not increased?
> A:     That's correct.  And I do acknowledge that was an error that we should have reflected.

Gallup Dep. 419:5-10.  No explanation is proffered.

The City and CHC have itemized the amounts they claim have been expended in reliance on Faulkner's representations that the Project's design was within projected budgets.  According to the City and CHC, they spent at least $2,673,079.30 from March 2003 through November 2004.  These expenses included fees paid to Faulkner for overseeing the design of the Project and reimbursements for allowable architectural fees.

### 2.    Arguments of the Parties.

Faulkner argues that pursuant to the Preconstruction Services Agreement, the City and CHC must pay Cole + Russell's fees for work Cole + Russell performed on the Project.  Interpreting the Preconstruction Services Agreement differently, the City and CHC disagree, arguing the agreement is subject to rescission, which eliminates any obligation to pay Faulkner any additional fees thereunder.

Faulkner next argues that the Preconstruction Services Agreement prohibits CHC and the City from seeking damages from Faulkner.  Responding, CHC and the City argue the language Faulkner claims insulates it from damages does not have the effect pressed by Faulkner.

These arguments are addressed in turn.  Because this is Faulkner's motion, factual disputes are resolved in favor of the City and CHC.

### 3.    Does the Preconstruction Services Agreement Require the City and CHC to Reimburse Faulkner for Cole + Russell's Claimed Fees?

The Court first turns to whether the Preconstruction Services Agreement requires the City or CHC to reimburse Faulkner for all fees claimed by Cole + Russell or whether the Preconstruction Services Agreement limits the exposure of the City and CHC to the budget listed in Exhibit A to the Preconstruction Services Agreement.

The rules of contract interpretation set forth above apply here as well.  Unlike the contract analyzed above, the Preconstruction Services Agreement does not contain an integration clause.  In fact, the Preconstruction Services Agreement contemplates future agreements

47

between CHC and Faulkner, indicating the parties did not intend it to be a final agreement.  As a result, extrinsic evidence is properly considered in the following analysis.

Faulkner opens by referencing the recitals of the Preconstruction Services Agreement that define the Preconstruction Services Faulkner was to provide.  Those services included "managing and administering the work of the Architect and the Design Agreement . . . for the design, construction, and equipping of the Project and construction planning and administering the competitive bidding [on certain elements of the Project]."  Preconstruction Services Agreement, at 1.[10]  Faulkner claims all design services performed by Cole + Russell can be swept into this language.[11]

Faulkner also points to section 3, entitled "Preconstruction Fees," as listing fees to which it is entitled.  The introductory clause to section 3 reads as follows:

> The fees to be charged by [Faulkner] in connection with this Agreement shall be calculated as follows:  $475,000 for the Preconstruction Work (all of which shall be credited toward the first 50% of the Development Fee), plus the direct cost of any related expenses of [Faulkner] in connection with performance of the Preconstruction Work. . . . .   All additional work authorized by [CHC] pursuant to a Preconstruction Services Change Order .

---

[10] The "Design Agreement" is the Architectural Design Services Agreement between CHC and Cole + Russell, which was assigned to Faulkner after execution of the Preconstruction Services Agreement.  See Preconstruction Services Agreement, at 2.

[11] According to CHC and the City, section 5 alone lists the architectural fees for which Faulkner is entitled to reimbursement.  Section 5 provides,

> [Faulkner] anticipates entering into a design agreement with Cole + Russell Architects (the "Design Team").  The Design Team has performed design services under a prior agreement with [CHC].  [CHC] intends to assign this prior agreement to [Faulkner] upon execution and delivery of this Agreement.

Design Services Agreement § 5.  Section 5 does not set forth those fees to which Faulkner is entitled to receive for Preconstruction Work.  In fact, section 5 does not require CHC to pay Faulkner anything, does not require Faulkner to enter into an agreement with Cole + Russell, and it does not set forth the terms of such an agreement.  Section 5 merely expresses that CHC "intend[ed]" to assign an agreement to Faulkner and that Faulkner "anticipate[d]" entering into an agreement with Cole + Russell related to the Project's design.  As a result, section 5 is unhelpful to CHC and the City.

48

> . . shall be performed upon the terms set forth in such Preconstruction
> Services Change Order.

Preconstruction Services Agreement § 3.  Faulkner points to Gallup's interpretation of this

language advanced in his December 16, 2004 letter to Fausett.  Therein, Gallup expressed his

belief that CHC agreed to pay $2,242,000 for architectural services pursuant to Exhibit A to the

Preconstruction Services Agreement, as well as $474,012 in "additional fees."[12]  This total did

not include "additional fees" of $290,000 "for a 'Project without Faulkner as Program [sic]

Manager.'"  Faulkner App. 121-122.  Gallup also alluded to an outstanding balance of $45,000

that he claimed CHC "owed under the terms of our Agreement."  Faulkner App. 122.[13]

   Under section 3 of the Preconstruction Services Agreement, Faulkner was entitled to

payment for "the direct cost" of any "related expenses . . . in connection with performance of the

Preconstruction Work."  While the term "related expenses" is undefined, Preconstruction Work

includes "managing and administering the work of the Architect and the Design Agreement."  A

careful reading of section 3 reveals it does not obligate CHC to pay for a specific amount for

architectural services as set forth in any particular budget, including the much-discussed Exhibit

A.[14]  While Faulkner is entitled to reimbursement for "managing and administering the work of

---

[12] As noted above, section 1 of the Preconstruction Services Agreement requires a Preconstruction Services Change Order to change the scope of the Preconstruction Services.  See Preconstruction Services Agreement § 1.  The parties have identified no Preconstruction Services Change Orders present in the record.

[13] The record establishes elsewhere that Faulkner represented total architectural fees for the Project would be approximately $2.2 to $2.3-million.  Faulkner represented in each and every budget provided to CHC that the total amount for architectural fees would be within that band.  At his deposition, Gallup recognized this approximation was an "error, and that an additional $677,000 was due for architectural fees" compared to those budgets submitted.  Gallup did not identify a provision in a contract requiring CHC or the City to pay Faulkner for that additional amount.

[14] In fact, the Preconstruction Services include requirements that Faulkner
   negotiate for the assumption and administration of all risks, responsibilities and
   obligations associated with the execution of all General Contract Work not
   assumed by the Contractor under the General Contract and all work to be

the Architect and the Design Agreement," the fees Cole + Russell claims are unpaid are not management and administration fees, they are fees for services rendered.  There is a difference between administering and managing Cole + Russell's work and a contract Cole + Russell had executed with CHC – for which Faulkner is entitled to reimbursement – and paying Cole + Russell's fees arising under the contract Faulkner is administering and managing.[15]

Because Faulkner has identified no contractual language requiring the City or CHC to pay Faulkner for balances Cole + Russell is demanding from Faulkner, this portion of Faulkner's motion must be **denied**.

### 4. Are the City and CHC Contractually Barred from Recovering Damages From Faulkner?

Finally, Faulkner claims the City and CHC are contractually precluded from seeking damages from Faulkner.  According to Faulkner, each cause of action brought by the City and CHC is based on Faulkner's alleged failure to design and develop the Project within budgets it provided.  As a result, Faulkner argues, section 13(o) of the Preconstruction Services Agreement restricts the types of damages CHC and the City may now recover.

---

performed hereunder and under the Construction Management Agreement . . . including, without limitation [various force majeure events,] and otherwise necessary to <u>deliver to [CHC], on time and at a cost no greater than the final budget for the Project determined in accordance with Section 7 herein and on Exhibit A</u> . . . .

Preconstruction Services Agreement, at 1-2 (emphasis added).  This term makes clear that Faulkner was only burdened with "negotiating" with an eye toward designing the Project in accordance with a budget to be created in accordance with section 7.  <u>See</u> Preconstruction Services Agreement § 7.  Section 7 does not obligate the City or CHC to reimburse Faulkner for excess architectural fees, but instead requires – with potential termination of the Preconstruction Services Agreement the penalty for failure – the parties to draft a final budget within a certain variance of the preliminary budget listed in Exhibit A to the Preconstruction Services Agreement.

[15] Of course, the monies Cole + Russell seeks could be a "direct cost of [a] related expense[]," <u>see</u> Preconstruction Services Agreement § 3, and therefore subject to potential reimbursement, but Faulkner has not pointed to record support showing the absence of a fact question regarding whether the fees Cole + Russell seeks are of that type.

Resisting, the City and CHC first argue all claimed damages arise from misrepresentations by Faulkner with respect to its ability to control the Project's budget.  As a result, they claim, they are entitled to rescind the Preconstruction Services Agreement.  Additionally, CHC and the City argue section 13(o), which limits damages "arising from [the] agreement" is not applicable because the damages claimed do not arise from the agreement, they arise from misrepresentations of Faulkner's.  Further, CHC and the City claim they are not seeking "indirect, incidental, consequential, special or exemplary damages," nor do they seek damages quantifiable as lost revenue or anticipated profits.  Instead, CHC and the City argue, sections 13(i) and 13(o), when read together, permit CHC to recover "any and all remedies provided by law."

Alternatively, CHC and the City claim, rescission of the Preconstruction Services Agreement is appropriate, rendering any clauses restricting the types of available damages inapplicable.  If the contract is rescinded, they argue, they are entitled to be placed in the position they occupied before the Preconstruction Services Agreement was executed.  As a result, CHC and the City conclude, they are entitled to recover from Faulkner monies expended under the contract.

### a.    The Exculpatory Clauses.

The rules of contract interpretation discussed above apply in equal force here.  As a result, sections 7, 13(i), and 13(o) must be read together, in the context of the agreement as a whole, to determine whether the Preconstruction Services Agreement restricts the types of damages CHC and the City seek to recover from Faulkner.

Iowa law recognizes the right of parties to a contract to limit liability for damages by contract, but the language limiting damages must be clear and unambiguous.  Terms limiting liability typically exempt a party from liability for its own negligent acts or the acts of another.  E.g., Gabrill v. Adams County Fair & Racing Ass'n, 666 N.W.2d 592, 596 (Iowa 2003) (collecting cases); Payne Plumbing & Heating Co. v. Bob McKiness Excavating & Grading,

Inc., 382 N.W.2d 156, 159-60 (Iowa 1986); Farmers Elevator Co. v. Chicago, Rock Island, & P.

R.R. Co., 149 N.W.2d 867, 870 (Iowa 1967).  Faulkner argues sections 7 and 13(o) of the Pre-

construction Services Agreement bar the City and CHC from recovery.

It is difficult to see how section 7 prevents the City or CHC from recovering damages

from Faulkner.  Section 7 lists preliminary budget figures and obligates the creation of a final

budget to be developed within thirty days after completion of bidding for the General Contract

that did not exceed the preliminary budget figure plus a variance.  Section 7 provides that if the

final budget fell outside the variance or was not developed on time, CHC or the City could

terminate the Preconstruction Services Agreement.  The language of section 7 in no way limits

damages recoverable by the City or CHC.  Therefore, the cases upon which Faulkner relies are

inapposite.  See, e.g., State Pub. Defender v. Iowa Dist. Ct., 594 N.W.2d 34, 37-3 (Iowa 1999)

(variance from hourly rate published in fee guidelines improper because the contract providing

for payment incorporated the guidelines, thus limiting the rate of payment).  Additionally, there

is no evidence the City or CHC relied upon section 7 to terminate the Preconstruction

Services Agreement.

Turning to section 13(o), the parties to the Preconstruction Services Agreement agreed to

hold each other harmless for "indirect, incidental, consequential, special or exemplary damages .

. . arising from" the agreement unless such damages were classifiable as a personal injury or

property damages.  Preconstruction Services Agreement § 13(o).  This shield extends until

"completion of the Definitive Agreements."  Preconstruction Services Agreement § 13(o).

Neither party has submitted evidence that the Definitive Agreements were completed.

In Count I of their Complaint, the City and CHC seek rescission of the Preconstruction

Services Agreement, claiming the existence of certain misrepresentations occurring before and

after execution of the agreement.  Because the alleged misrepresentations occurred at least in

part before execution of the Preconstruction Services Agreement, it cannot be said that the

remedy sought is based on conduct arising from the Preconstruction Services Agreement.  As explained more fully below, if the City and CHC succeed in rescinding the Preconstruction Services Agreement, any damages suffered by the City and CHC could not arise from the agreement because there would be no agreement for the damages to arise from.

CHC and the City next argue section 13(o) does not preclude claims that do not arise under the agreement, and is therefore inapplicable to Counts II through IV of their Complaint. Recalling, Counts II and III set forth fraudulent and negligent misrepresentation claims, respectively.  The gist of both claims is that Faulkner falsely represented that budgets submitted were realistic and that the Project could be completed under financial terms amicable to the City and CHC.  In Count IV, CHC and the City bring a breach of fiduciary duty claim.  CHC and the City argue Faulkner's specialized expertise in designing hotels and conference centers gave rise to a fiduciary duty on the part of Faulkner to ensure the Project's design and construction was within budgets presented in the Memorandum of Understanding and Preconstruction Services Agreement.  Because CHC and the City rely, in part, on damages arising from misrepresentations regarding budgets presented as part of the Memorandum of Understanding and an alleged breach of a fiduciary duty created, in part, by the Memorandum of Understanding, damages suffered by the City and CHC did not arise exclusively under the Preconstruction Services Agreement.[16]

---

[16] Section 13(i)(iv) is not particularly helpful to the City and CHC.  Recalling, section 13(i)(iv) states that "[u]pon termination for breach of this Agreement for cause, [Faulkner] shall not be entitled to receive further payments until the Preconstruction Work is completed, if completed by others."  Section 13(i)(iv) further provides that "[i]n addition, [CHC] shall be entitled to any and all remedies provided by law."  The parties' placement of the provision permitting CHC to recover "any and all remedies provided by law" next to the termination for cause language suggests the "any and all remedies provided by law" clause is triggered only if the agreement is terminated "for cause" as defined in subsections 13(i)(iii)(A) through (D).  The record does not show the City and CHC relied on any of those sections to terminate the Preconstruction Services Agreement.  It follows that the "any and all remedies provided by law" clause in section 13(i)(iv) is not available to CHC or the City for purposes of the present motion because the Preconstruction Services Agreement was not terminated "for cause."

b.   **Impact of the Rescission Claim.**

CHC and the City alternatively argue that because they seek rescission of the Precon-struction Services Agreement, the clauses which could otherwise limit the types of recoverable damages are not applicable.  Faulkner argues the remedy of rescission is unavailable under the circumstances of this case.

Rescission is "the unmaking of a contract."  Dailey v. Holiday Distrib. Corp., 151 N.W.2d 477, 482 (Iowa 1967); Kunde v. O'Brian, 243 N.W. 594, 595 (Iowa 1932); Butler Mfg. Co. v. Elliott & Cox, 233 N.W. 669, 670 (Iowa 1930).  Typically, if "the court allows a rescission, it founds its action, generally speaking, upon a previous mutual agreement to rescind or a fraud on the part of one party of the contract and the election to rescind therefor by the other party thereto."  Kunde, 243 N.W. at 595; accord Butler Mfg. Co., 233 N.W. at 670; see also Blake v. Osmundson, 159 N.W. 766, 773 (Iowa 1916) ("Where [a] contract is procured by fraud, the party defrauded may rescind it, because fraud vitiates all contracts, and the party who has been defrauded in the contract may retire from its performance without blame.").  If a contract is rescinded, the injured party must be restored "'to as near the condition that existed prior to the making of the contract as possible.'"  Kunde, 243 N.W. at 596 (quoting Rickman v. Houck, 184 N.W. 657, 661 (Iowa 1921)).

CHC and the City correctly identify the following elements to a claim of equitable rescission based on misrepresentation: "(1) a representation, (2) falsity, (3) materiality, (4) an intent to induce the other to act or refrain from acting, and (5) justifiable reliance."  Hyler v. Garner, 548 N.W.2d 864, 872 (Iowa 1996); accord City of Ottumwa v. Poole, 687 N.W.2d 266, 269 (Iowa 2004); Rubes v. Mega Life & Health Ins. Co., 642 N.W.2d 263, 269 (Iowa 2002).

Proof of intent to deceive is unnecessary to the cause of action.  Poole, 687 N.W.2d at 269; Rubes, 642 N.W.2d at 269; Hyler, 548 N.W.2d at 872.[17]

There are abundant fact questions on each element.  As demonstrated by the Court's extensive factual recitation set forth above, a reasonable finder of fact could determine Faulkner represented that it was scrutinizing plans and specifications created by Cole + Russell to create accurate budget forecasts.  Likewise, a jury could find Faulkner represented that the Project was proceeding within financial parameters acceptable to the City and CHC.  The record could also show Faulkner's representatives were aware portions of the Project budgets had not been esti-mated at the time of public bids, but failed to inform the City or CHC.  See Poole, 687 N.W.2d at 269 ("[I]n some instances a failure to disclose material facts may be the equivalent of a false assertion."); Rubes, 642 N.W.2d at 270 (holding that "a representation includes not only an affirmative statement but the omission or nondisclosure of a pertinent fact").  Control of the Project's budget and the provision of accurate cost estimates was certainly a material part of the Preconstruction Services Agreement, because it is unlikely the City or CHC would have com-pensated Faulkner at all had it been aware the projected budgets were inaccurate.  See Rubes, 642 N.W.2d at 270 ("Factors bearing on materiality include whether a representation influences a person to enter into a transaction, . . . induces that person to act, or where the transaction would not have occurred without it." (quotation marks omitted; alteration in the original)).

A fact finder examining the record could also determine CHC and the City have demon-strated Faulkner's representations that the Project was proceeding within established budget parameters were false.  Proof that Faulkner was aware its budget forecasts were wrong is, of

---

[17] The Supreme Court of Iowa has noted that the species of rescission identified by CHC and the City is available where "'fraudulent misrepresentations lead[] to the creation of a contract.'" Rubes, 642 N.W.2d at 269 (quoting Robinson v. Perpetual Servs. Corp., 412 N.W.2d 562, 568 (Iowa 1997)); accord Blake v. Osmundson, 159 N.W. 766, 773 (Iowa 1916).  Each alleged mis-representation identified by the City and CHC appears to have occurred after the Preconstruction Services Agreement was executed.  However, Faulkner does not address this argument, so the Court declines to decide that the City and CHC are not entitled to rescission on this basis.

course, unnecessary.  See Poole, 687 N.W.2d at 269 ("[A]n action to rescind a contract based on misrepresentations . . . does not depend on knowledge of the falsity . . . .").  Each and every budget submitted by Faulkner was submitted for the purpose of securing additional payments; whether Faulkner's representatives intended to deceive the City or CHC is immaterial.  See Hyler, 548 N.W.2d at 871-72 (noting that proof of intent to deceive is not a necessary element); accord Poole, 687 N.W.2d at 269; Rubes, 642 N.W.2d at 269.  In reliance on the belief Faulkner was providing services in accordance with the Preconstruction Services Agreement, the City and CHC claim to have expended some $2.6-million on Faulkner and its consultants.

The Court concludes a genuine issue of material fact exists with respect to each element of the equitable rescission claim advanced by the City and CHC.  As a result, even if the Preconstruction Services Agreement prevented the City and CHC from recovering damages from Faulkner, CHC and the City have an alternative method of recovery.  Therefore, insofar as Faulkner's motion for summary judgment is based on the premise that the City and CHC are prohibited from seeking damages, its motion is **denied**.

## III.   Coralville Parties' Motion for Summary Judgment.

As noted above, the Coralville Parties seek summary judgment on Count VI of Faulkner's First Amended Third-Party Complaint.  Count VI sets forth a tortious interference with contract claim against the Coralville Parties.  Faulkner alleges the Coralville Parties had knowledge of the Design Services Agreement under which Faulkner alone was to administer and be responsible for communication relating to the design services for the Project.  Faulkner alleges the Coralville Parties willfully and intentionally interfered with the performance of the Design Services Agreement by requesting Cole + Russell to perform additional services and make design changes, thus increasing the cost of services performed by Cole + Russell.  Faulkner claims Cole + Russell now seeks compensation from Faulkner for the additional services and changes ordered by the Coralville Parties.

Moving for summary judgment on Count VI, the Coralville Parties claim the record contains no genuine issue of material fact with respect to the element of damages.

**A.    Material Facts.**

Agreement among the parties on many material facts simplifies resolution of this motion. For example, the parties agree that under the Design Services Agreement, Cole + Russell agreed to provide design services for the Project at Faulkner's direction.  The parties further agree that in its claims against Faulkner, Cole + Russell seeks damages of approximately $677,000 for architectural work performed by Cole + Russell pursuant to the Design Services Agreement.

The Coralville Parties claim there is no evidence Cole + Russell is seeking to recover damages from Faulkner for architectural services rendered at the direction of the Coralville Parties without Faulkner's prior approval or knowledge.

For support, the Coralville Parties cite the deposition testimony of Bischoff, a Cole + Russell architect:

> Q:    So the total amount of architectural fees and interest that Faulkner has not paid is $677,213.79.  Am I understanding that correctly?
> A:    Yes.
> . . . .
> Q.    . . . .  The invoices that you and I have just discussed . . . that total $677,000, was all of that architectural work authorized by Faulkner?
> A:    Yes.
> Q:    Do any of these invoices represent fees for services rendered by Cole + Russell at the request of the City or CHC or Bill Boyd that were not approved by Faulkner?
> A:    No.
> Q:    And is this all of the fees that you know of that Cole + Russell claims that Faulkner still owes?
> A:    To the best of my recollection, yes.
> Q:    [There is also an] invoice from Heapy Engineering for $76,500, correct?
> A:    Yes.
> Q:    [You were asked] a lot of questions about whether these changes were requested by Bill Boyd or by the Marriott, and whether Faulkner approved these changes.  Do you recall that line of questioning?
> A:    Yes.
> Q:    Did Faulkner approve all of this work?

A:   Not directly.

Q:   Did Faulkner approve all of the design changes that necessitated this work?

A:   Yes.

Q:   When you say Faulkner did not directly approve all of this work, can you explain what you meant by that?

A:   This work was done – I should say some of this work was done after the plans were locked down.  Their request to have us go ahead and make the changes was in our minds approval to go ahead with the additional services.

Q:   Okay.  And when you said their requests to go ahead and make these changes after the plans were locked down, to whom were you referring?  Who made those changes – the request for those changes?

A:   To the best of my recollection, Pat Farrell.

Q:   From Faulkner?

A:   Yes.

Bischoff Dep. 157:24-158:2; 158:15-160:7.

Additionally, the Coralville Parties point to two interrogatory answers provided by Faulkner.  In an answer to an interrogatory seeking information supporting Faulkner's allegation that Cole + Russell performed additional services and design changes requested by the Coralville Parties that  increased the cost of the services provided by Cole + Russell, Faulkner provided the following answer:

> Please see the services listed in detail in deposition exhibits 53 . . ., 68 . . ., and 148 . . . .  All of these additional services and design changes were requested by Bill Boyd on behalf of the City and CHC.  The changes requested in September 2004 and detailed in the proposal letter, which is deposition exhibit 53, resulted in increased costs in the amount of $133,800.  The additional services relating to designing for the possible future addition of two additional floors to the hotel tower, which was requested in June 2004, resulted in additional charges of $70,960.  Finally, the additional services detailed in deposition exhibit 148 by Heapy Engineering, LLC, which were requested in October/November 2004, resulted in additional charges of $76,500.  [Faulkner] did not have advanced [sic] knowledge that additional work and design changes would result in additional fees for any of the changes detailed in deposition exhibit 148.

FaulknerUSA, Inc.'s Ans. to Second Set of Interrogs. from City of Coralville & Coralville

Hospitality Corp. # 5.  The Coralville Parties claim the exhibits referenced each relate to work

approved in advance by Faulkner.

Exhibit 53 is a letter dated September 3, 2004, authored by John Russell of Cole +

Russell sent to Farrell of Faulkner.  In this letter, Cole + Russell seeks a "favorable response" to

a proposal by Cole + Russell to perform additional design services for $133,800.  Coralville

Parties App. 359-360.  Specifically, Cole + Russell proposed "[e]liminat[ing] all parking under

the building;" "[r]elocat[ing] the building on the site and revis[ing] Civil and Landscaping plans,

parking and vehicular circulation;" "[r]evis[ing] the fan coil unit location in guest rooms;" and

"[d]elet[ing] the skylight above the pool."  Coralville Parties App. 359; see also Farrell Dep.

50:15-52:8.  By letter dated September 7, 2004, Faulkner authorized design changes related to

the skylight over the pool but disputed the cost of the other proposed changes.  In an e-mail

exchange occurring on September 10, 2004, between Farrell and a Cole + Russell representative,

Faulkner approved the remainder of the work suggested.  Therein, a Cole + Russell representa-

tive wrote, "We are assuming that all of the revisions to the scope and fee previously outlined in

our additional services proposal (eliminate garage, redesign fan coil unit in guest rooms, relocate

building, delete clerestory roof over pool) are approved and we are proceeding with these revi-

sions."  Coralville Parties App. 437 (emphasis added).  As the emphasized language indicates,

Cole + Russell was seeking clarification regarding whether Faulkner had approved both the

scope and cost of the revisions in Cole + Russell's September 3, 2004, proposal.  On behalf of

Faulkner, Farrell responded, "This is correct.  Proceed with these revisions."  Coralville Parties

App. 437.

The second document referenced in Faulkner's interrogatory answer, Exhibit 68, is an e-

mail dated June 1, 2004, from Gallup to Boyd and individuals at Cole + Russell.  Therein,

Gallup, on behalf of Faulkner, writes, in relevant part, "Per our discussion of today we have

59

directed C+R to proceed with the hotel design to accommodate the future expansion of two (2) additional typical guestroom floors."  Coralville Parties App. 369.  Although Gallup expressed concerns over the number of elevator shafts a redesign could require, Gallup's e-mail clearly directs Cole + Russell to proceed with design changes that would contemplate the possible future addition of two floors to the hotel tower.

The third document referenced, Exhibit 148, is a letter and invoice from Heapy Engineering to Bischoff indicating an increased charge of $76,500 "due to previously approved design changes" in a number of areas.  See Coralville Parties App. 438-440.  While the letter indicates the City requested Heapy to "add piping and specifications to accommodate a future central chilled and hot water plant" resulting in increased costs of $1720, and that Marriott "request[ed] that the hot water system have an additional booster heater added" resulting in increased costs of $1200, Heapy Engineering's letter and invoice does not indicate who approved the design changes.[18]  The Coralville Parties point to Bischoff's deposition – quoted above – as evidence that Farrell of Faulkner approved the changes resulting in Heapy Engineering's increased costs.  Finally, the Coralville Parties point to the portion of Faulkner's answer referencing the Heapy Engineering invoice, where Faulkner claims it "did not have advanced [sic] knowledge that additional work and design changes would result in additional fees for any of the changes detailed in deposition [E]xhibit 148."  FaulknerUSA, Inc.'s Ans. to Second Set of Interrogs. from City of Coralville & Coralville Hospitality Corp. # 5.  This state-ment indicates Faulkner does not dispute authorizing additional work, it was merely unaware of extra fees that would result from design changes.

The Coralville Parties rely on an additional interrogatory answer.  During discovery, the Coralville Parties propounded the following interrogatory:

---

[18] On page two of the letter, Heapy Engineering indicates "[s]ome of the items listed above We [sic] have been given approval to make the required changes."  Coralville Parties App. 439.  No party explains the meaning of this statement.

> If you contend that there were any additional services or design changes performed by the architect at the request of Bill Boyd, the City, or CHC which were not agreed to and approved by Faulkner, describe each such design change or additional service and set forth the amount for which Faulkner has been billed for these design changes or services by Cole + Russell Architects.

Second Set of Interrogs. from City of Coralville & Coralville Hospitality Corp. # 6.  Faulkner provided the following answer:

> [Faulkner] believes that Bill Boyd directed Vanwinkle-Jacob Engineering, Inc. to increase the size of the pond on the east side of the hotel within weeks before the bid date without [Faulkner]'s knowledge. [Faulkner] is unsure whether the architect billed for these design changes or services.  At this point in the discovery process, [Faulkner] is unsure whether there were other design changes directed by Bill Boyd, the City, or CHC without [Faulkner]'s knowledge.  Certainly, there was communication between Boyd, the City, and CHC that was occurring without [Faulkner]'s knowledge.

FaulknerUSA, Inc.'s Ans. to Second Set of Interrogs. from City of Coralville & Coralville Hospitality Corp. # 6.  Neither Faulkner nor the Coralville Parties have provided materials supplementing this answer.

The Coralville Parties conclude by arguing Faulkner has presented no evidence that Cole + Russell has made any claim against Faulkner for fees arising from design changes requested by any of the Coralville Parties that were not approved by Faulkner.  Faulkner admits this fact, but "affirmatively states that its claim for damages against City/CHC/Boyd is not limited to any [amount Cole + Russell] claims for design service fees."  This statement is in partial conflict with Faulkner's First Amended Third-Party Complaint, where Faulkner accuses the Coralville Parties of "requesting that [Cole + Russell] perform additional services and design changes which increased the cost of the services performed by Cole + Russell."  First Am. Third-Party Compl. ¶ 44.  While Faulkner could be alluding to damages incurred as a result of "additional services," it has not elaborated by stating precisely what its additional damages claims are.  And the Court cannot presume such facts.

For its resistance, Faulkner points to an e-mail authored by John Russell from Cole +
Russell written to Gallup regarding a separate October 6, 2004, e-mail from Boyd wherein Boyd
contacted Cole + Russell and its consultants.  In Russell's e-mail, he asked Gallup,

> Do you think it is possible to get this guy to stop contacting our consultants?
> They have enough problems getting finished without these constant inter-
> ruptions and mixed messages.

Faulkner Supp. App. 1.  Faulkner identifies this e-mail as representative of Boyd's interference
during the design phase.  Boyd's original e-mail, appearing just below Russell's, was addressed
to a "Kirsta," but sent to others.  Faulkner Supp. App. 1.  Boyd's e-mail reads,

> Please put together and [sic] agenda for the Advisory Committee meeting
> from 7:30 am to 8:45 am Wednesday the 13th and our Development Team
> Meeting following at 9:00 am.  Who will be attending and what will be
> covered during both meetings.  I would like to send agenda [sic] out by
> Friday to Advisory Committee members and the Development Team should
> have clear direction by then as well.  This is our last meeting before bidding!

Faulkner Supp. App. 1.  In his e-mail, Boyd does not order or request additional services or
design from Cole + Russell.

Faulkner has also produced an affidavit prepared by Farrell.  Therein, Farrell testified,

> I also think that Bill Boyd's interference with the design process and the
> continuous changes that the City imposed during the last three months (and
> mainly in the last month) before the bid date contributed to the increase in
> bids.  Not only did the scope increase but I think it also caused concern
> among the sub[contractors] and the general contractors and it was reflected
> in increased margins to protect themselves.

Farrell Aff. ¶ 13, Mar. 17, 2006.  A number of these allegations are conclusory, so their impor-
tance is limited.  For example, Farrell does not say what "the continuous changes" were "that the
City imposed" that allegedly contributed to increases in the bid amounts.  Additionally, Farrell
does not identify any services or design changes performed by Cole + Russell without
Faulkner's approval.

Farrell also testified,

> I think that Bill Boyd also encouraged overdesign by Cole and Russell and
> the interior designer.  I remember one meeting where there [sic] design
> changes which were suggested by Bill Boyd and I said these changes were
> going to add at least a million dollars to the cost.  Bill Boyd said, "Don't
> worry about it.  We'll get the money."  That kind of attitude only encour-
> aged the designers to keep adding things to the plans and the fact that the
> design build approach had been eliminated meant that Faulkner didn't have
> the ability to control the design in the same way it would if it was a true
> design build method.

Farrell Aff. ¶ 14.  Faulkner also points to the deposition of Kirsta Scranton, where she discussed

a meeting occurring on October 11, 2004, involving Boyd,

> Q:    [T]ell me what you're looking at there regarding a discussion of cost.
> A:    [A notebook created by Scranton noting discussion of costs and
> budgets] states, 10/11 meeting with Master Builders design group.  Took
> meeting minutes.  Very chaotic, unorganized meeting.  Also got schedule
> that won't work.  Talked with Bill Boyd and Pat on conference call.
> November 16th bid date, 3:00.  October 27, 3 p.m., prebid, not 2:00.  BB,
> meaning Bill Boyd, stated it was not appropriate for me to discuss costs or
> schedules, that the City and Kelly have or can get the money.  If I continued
> asking or stating dollars were increasing, I would be removed . . . .
> Q:    Okay.  Do you remember that discussion?
> A:    Yes, I do.
> Q:    What was being discussed there in terms of costs?
> A:    This was the retaining wall revisions to the back and to the pond.

Scranton Dep. 149:3-21, Aug. 25, 2006.  While Scranton's recollection of the October 11, 2004,

meeting indicates the meeting was disorganized, the record is devoid of work or services the

Coralville Parties directed Cole + Russell to perform without Faulkner's approval.

Faulkner claims it "will present a case that Boyd's tortious interference with contract led

to incomplete designs by [Cole + Russell], led to over-budget bids by contractors, which led to

the failed bid on November 19, 2004."  As a result, Faulkner claims, fact questions exist

regarding whether it was damaged by any intentional interference on the part of the

Coralville Parties.

### B.   Analysis.

### 1.   Applicable Legal Standards.

The parties agree that to successfully prove the tort of intentional interference with a contract, a plaintiff must prove the following elements:

(1)   plaintiff had a contract with a third-party;
(2)   defendant knew of the contract;
(3)   defendant intentionally and improperly interfered with the contract;
(4)   the interference caused the third-party not to perform, or made performance more burdensome or expensive; and
(5)   damage to the plaintiff resulted.

Green v. Racing Ass'n of C. Iowa, 713 N.W.2d 234, 243 (Iowa 2006) (quoting Gibson v. ITT Hartford Ins. Co., 621 N.W.2d 388, 399 (Iowa 2001), in turn quoting Jones v. Lake Park Care Ctr., Inc., 569 N.W.2d 369, 377 (Iowa 1997)); accord  RTL Distrib., Inc. v. Double S Batteries, Inc., 545 N.W.2d 587, 590 (Iowa 1996); Burke v. Hawkeye Nat'l Life Ins. Co., 474 N.W.2d 110, 114 (Iowa 1991); Schaefer v. Cerro Gordo County Abstract Co., 525 N.W.2d 844, 847 (Iowa 1994); see also Grimm v. US West Commc'ns, Inc., 644 N.W.2d 8, 12 (Iowa 2002); Revere Transducers, Inc. v. Deere & Co., 595 N.W.2d 751, 763 (Iowa 1999); Berger v. Cas' Feed Store, Inc., 543 N.W.2d 597, 599 (Iowa 1996); Economy Roofing & Insulating Co. v. Zumaris, 538 N.W.2d 641, 649 (Iowa 1995); Water Dev. Co. v. Bd. of Water Works, 488 N.W.2d 158, 161 (Iowa 1992); Nesler v. Fisher & Co., 452 N.W.2d 191, 198 (Iowa 1990).  There are two species of this tort.  One occurs if the defendant prevents the plaintiff from performing the contract or causes performance to be more expensive or burdensome for the plaintiff; the other occurs where the defendant induces or causes the other party to the contract not to perform or makes performance more difficult or expensive for the other party to the contract.  See Nesler, 452 N.W.2d at 194-95; Restatement (Second) of Torts § 766A cmt. *c* (1979).  Compare Restatement (Second) of Torts § 766, with Restatement (Second) of Torts § 766A.  Under either theory, proof of damages is an essential element for recovery.  See Green, 713 N.W.2d at 243 (listing among  the elements of the tort proof that "damage to the plaintiff resulted"); Gibson, 621 N.W.2d at 399

(same); <u>Jones</u>, 569 N.W.2d at 377 (same); <u>RTL Distrib.</u>, 545 N.W.2d at 590 (requiring proof of any "[r]esultant damage" to the party harmed); <u>Schaefer</u>, 525 N.W.2d at 847 (listing proof of damages as an essential element); <u>Burke</u>, 474 N.W.2d at 114 (same).  For the purposes of this motion, the Coralville Parties concede the existence of fact questions on the first four elements, focusing their argument on the fifth element.

2.     **Discussion.**

Because this is the Coralville Parties' motion, the record is viewed favorably to Faulkner. As noted above, the only damages sought by Faulkner on its intentional interference with existing contract claim are monies equaling approximately $677,000 representing work performed by Cole + Russell, which Cole + Russell seeks to recover in its action against Faulkner. The Coralville Parties argue that because each component of this work was approved by Faulkner or performed at Faulkner's direction, Faulkner was not damaged as a result of any interference caused by the Coralville Parties.  Resisting, Faulkner alleges the amount it seeks resulted from design changes requested by the Coralville Parties that were either unapproved or unauthorized by Faulkner.

Faulkner identified three groups of documents in an interrogatory answer calling for specific instances of services or design changes performed by Cole + Russell that form the basis of Faulkner's intentional interference with an existing contract claim against the Coralville Parties.  As a result, the analysis focuses there.

Beginning with Exhibit 68, that document contains explicit approval from Gallup to proceed with design changes.  As a result, that design change was approved by Faulkner.  Consequently, there is no fact question regarding whether the Coralville Parties "requested that [Cole + Russell] perform additional services and design changes which increased the cost of services performed by [Cole + Russell]."  First Am. Third-Party Compl. ¶ 44.  On this record the Court must conclude those services were requested by Faulkner.

Exhibit 53 and the e-mails associated with that document reveal similar conduct.  Exhibit 53 contains a list of proposals by Cole + Russell related to specific aspects of the Project.  A September 7, 2004, e-mail issued by a Faulkner representative indicated approval with one element, and an e-mail exchange occurring on September 10, 2004, approved of the remainder.  As a result, the record establishes the Coralville Parties did not request these additional services; Faulkner did.

Exhibit 148, the Heapy Engineering letter and invoice, requires closer analysis.  The letter indicates charges of $76,500 resulted from design changes that were previously approved, but neither the letter nor the invoice identifies the entity approving the changes.  Bischoff's testimony establishes that while Faulkner did "not directly" approve work leading to the fees detailed in Exhibit 148, Farrell's request to have Cole + Russell make changes resulting in additional fees, was, to Cole + Russell, "approval to go ahead with the additional services."  Bischoff Dep. 159:13-160:7.  This undisputed testimony reveals not only that Cole + Russell communicated with Farrell regarding the work associated with the Heapy Engineering invoice, but that Cole + Russell did not communicate with any of the Coralville Parties about the same.

Additionally, instead of denying that it authorized the design changes referenced in Exhibit 148, Faulkner claims to have been unaware of extra expenses associated with that work.  Faulkner's confession of ignorance is entirely different from an affirmative showing of the Coralville Parties requesting work and increasing costs.  More fundamental still, Faulkner's position does not demonstrate the Coralville Parties interfered with the Faulkner–Cole + Russell contractual relationship in a manner causing Faulkner to be liable for additional work performed by Heapy Engineering.  The fact that Faulkner may not have directly approved work performed by Heapy Engineering does not support a conclusion the Coralville Parties did, resulting in some damage.

Finally, there is debate regarding whether Faulkner approved or directed changes to a pond and retaining wall located on the site of the Project. In responses to the Coralville Parties' interrogatories, Faulkner advanced a belief that Boyd directed a company called Vanwinkle-Jacob Engineering to increase the size of the pond before the bid date without Faulkner's knowledge. Farrell avers via affidavit that this change was one of many made by Boyd just before the bid date. Farrell does not deny approving changes to the pond, nor does he say Boyd made such a request or demand to Cole + Russell. In fact, Scranton's deposition shows Farrell's presence at a meeting where changes to the pond were discussed. And while the idea for changes to the pond or retaining wall may have been Boyd's, the record does not include evidence that the Coralville Parties' ideas came to fruition through Cole + Russell's labors without Faulkner's approval or involvement.

Two loose ends remain. In an interrogatory response, Faulkner referenced "communi-cation between Boyd, the City, and CHC that was occurring without [Faulkner]'s knowledge" as evidence of damages. FaulknerUSA, Inc.'s Ans. to Second Set of Interrogs. from City of Coralville & Coralville Hospitality Corp. # 6. Because Faulkner has not produced evidence that damages arose out of these "communications," this allegation is immaterial. Second, because Faulkner has cabined the factual pillars of its intentional interference with contact claim in its First Amended Third-Party Complaint to "request[s] that [Cole + Russell] perform additional services and design changes which increased the cost of services performed by [Cole + Russell] and for which [Cole + Russell] is now requesting compensation from [Faulkner]," First Am. Third-Party Compl. ¶ 44, Faulkner's positions staked during briefing related to this motion that "its claim for damages against City/CHC/Boyd is not limited to any [Cole + Russell] claims for design service fees" and that Boyd's communications with Cole + Russell led to over-budget bids by the contractors associated with the Project are untenable without amending its pleadings, a step unmade by Faulkner.

Faulkner's position that it "is unsure whether there were other design changes directed by Bill Boyd, the City, or CHC without [Faulkner]'s knowledge" does not generate a fact question. Such speculation, perhaps permissible during discovery, is insufficient at the summary judgment phase. And while Russell's October 6, 2004 e-mail to Gallup indicates frustration with communications between Boyd and Cole + Russell representatives, communications do not, <u>ipso facto</u>, cause damages.

### 3. Conclusion.

Faulkner has not pointed to evidence in the record creating a genuine issue of material fact with respect to whether Cole + Russell is seeking damages for costs incurred by Faulkner for work ordered or requested by the Coralville Parties. Because this is the sole basis upon which Faulkner's damages rest under Count VI of Faulkner's First Amended Third-Party Complaint, the Coralville Parties' Motion for Summary Judgment must be **granted**, and Count VI must be **dismissed**.

## IV. Cole + Russell's Cross-Motion for Summary Judgment on Faulkner's Counterclaim.

Finally, the Court turns to Cole + Russell's Cross-Motion for Summary Judgment on Faulkner's counterclaim against Cole + Russell.

For its counterclaim against Cole + Russell, Faulkner alleges the Letter Agreement and Design Services Agreement[19] establish that Faulkner would control the exchange of information, design, and delivery of documents relating to the Project between Cole + Russell and other parties, including the City, CHC and Marriott. Faulkner claims the City and CHC continually communicated new design requirements to Cole + Russell that required additional work and

---

[19] Faulkner again agrees to be bound by the final version of the Design Services Agreement for purposes of this motion. <u>See</u> FaulknerUSA's Response to Cole + Russell's Statement of Undisputed Material Facts in Support of Cross-Motion for Summ. J. ¶ 4. Paragraphs relevant to this motion are identical in both the draft and final versions. Citations appearing in this Part IV are to the final version.

increased costs.  According to Faulkner, after April 28, 2004, CHC specifically authorized Cole + Russell to perform additional design services beyond those contemplated in the Letter Agreement.  In fact, Faulkner claims CHC compelled this work contrary to the terms of the Letter Agreement, and Cole + Russell proceeded with the services without consulting Faulkner.

Faulkner claims this conduct breached the Letter Agreement and Design Services Agreement in two ways.  First, Faulkner claims Cole + Russell breached the agreements by performing work as directed by CHC and the City.  Second, Faulkner alleges Cole + Russell breached the agreements by communicating directly with representatives of CHC and the City.

Moving for summary judgment,[20] Cole + Russell argues the Design Services Agreement does not bar collaborative communications between Cole + Russell, the City, and CHC; instead, the Design Services Agreement set forth ground rules for Faulkner's approval of Cole + Russell's drawings, plans, and specifications.  Cole + Russell argues the Design Services Agreement not only acknowledges Cole + Russell, the City, CHC, and others, would communicate among each other about the Project's designs, but encourages such communication as essential to the Project.  Cole + Russell further claims the Design Services Agreement required Faulkner to include input from the City and CHC in written comments and approvals of Cole + Russell's

---

[20]  To support its motion Cole + Russell has elected to rely entirely on the pleadings and the language of the agreements existing between itself and Faulkner.  While this method of moving for summary judgment is entirely appropriate, see Fed. R. Civ. P. 56(b), because Cole + Russell does not challenge the factual premises of Faulkner's claim (i.e., that CHC and/or the City authorized Cole + Russell to perform additional design services for the Project and Cole + Russell performed those services without consulting Faulkner, see Countercl. ¶¶ 10-12), those facts are presumed true for purposes of this discussion.  See Cole + Russell's Reply to FaulknerUSA, Inc.'s Resistance to Cole + Russell's Motion for Summ. J. 5 ("[Cole + Russell] does not contend in its Motion that [Faulkner]'s breach of contract claim lacks factual foundation.").

Faulkner has attached two answers to interrogatories propounded by the City and CHC, claiming Faulkner's "answers outline facts which support [Faulkner]'s counterclaim against [Cole + Russell]."  FaulknerUSA's Br. in Resistance to Cole + Russell's Cross-Motion for Summ. J. 3.  Faulkner's answers are those used to support its intentional interference with contract claim against the Coralville Parties.

designs.  As a result, Cole + Russell concludes, it could not have breached the Design Services

Agreement or the Letter Agreement by communicating directly with the City and CHC or by

incorporating suggestions and requests of the City or CHC into its designs.

> **A.    Material Facts.**

The analysis begins with the portions of the Design Services Agreement Faulkner claims

Cole + Russell breached.  Paragraph 2.1.3.6 of the Design Services Agreement provides

as follows:

> [Faulkner] and [Cole + Russell] understand and agree that [CHC], City,
> [CHC]'s Authorized Representative, Marriott, Trustee and perhaps others,
> will need to review and provide comment regarding [Cole + Russell]'s
> Deliverables.[21]  [Cole + Russell] and [Faulkner] will review and agree upon
> a written document delivery, communication and comment protocol that
> will provide a practical, orderly, efficient and effective procedure for the
> meaningful and appropriate input reviews, input, elevations and comments
> of [CHC], City, [CHC] [sic], Marriott, Trustee and others ("Review Pro-
> tocol"). [Faulkner] and [Cole + Russell] will, from time to time, review and
> modify the Review Protocol as necessary to adjust it to the needs of the
> Project. [Cole + Russell] and [Faulkner] understand and agree that the
> design process for the Project is a collaborative one.  <u>Nothing herein is
> intended to limit the free flow of communications, data and informa-
> tion regarding the Project among [Cole + Russell], [Faulkner], [CHC], City,
> [CHC]'s Authorized Representative, Marriott, and the Trustee, and among
> others, as appropriate for the best interests of the Project</u>.  However, <u>only
> [Faulkner]</u> shall have the authority and responsibility <u>to issue comments to
> [Cole + Russell] that will be considered an approval of [Cole + Russell]'s
> Deliverables</u>, including the authorization to proceed to the next level of
> development or refinement of the Deliverables.  All of [Faulkner]'s
> comments and approvals shall be in written or graphic form and [Cole +
> Russell] shall be entitled to rely for all purposes on the comments and
> approvals that it receives from [Faulkner].  [Faulkner] shall be presumed to
> have consulted with and incorporated the comments, evaluations, recom-
> mendations and other input of [CHC], City, [CHC]'s Authorized Repre-
> sentative, Marriott, and the Trustee, among others, into its written comments
> and approvals.  <u>It is understood and agreed that in order to maintain the</u>

---

[21] "Deliverables" are "the physical manifestation of [Cole + Russell's] professional services to
[Faulkner] in hard copy, visual, graphic, and/or electronic forms such as drawings, sketches,
plans, specifications, reports and other textual or graphic materials for the review, evaluation,
consideration, and approval of [Faulkner]."  Design Services Agreement ¶ 1.4.

> Design Schedule and avoid unnecessary redesign efforts by [Cole +
> Russell], [Faulkner] will be the single point of formal approval for [Cole+
> Russell]'s Deliverables.  [Cole + Russell] will not proceed with the next
> stage or phase of its design services unless and until it receives written
> authorization to do so from [Faulkner], provided that the Design Schedule
> shall be adjusted whenever any comments or approvals are not received by
> [Cole + Russell] in accordance with the then current Design Schedule.

Design Services Agreement ¶ 2.1.3.6 (emphases added).  Faulkner points to paragraph 1.7 as

further regulating the flow of communications among the parties.  That paragraph reads,

> [Cole + Russell] shall exercise its reasonable professional efforts to com-
> municate with [CHC] only through [Faulkner] unless otherwise directed by
> [Faulkner] in writing.  [Faulkner] shall exercise its best efforts to communi-
> cate with [Cole + Russell]'s Consultants only though [Cole + Russell],
> unless some specific Project requirement dictates otherwise.  All such
> communications shall be reported, confirmed, coordinated, and recorded
> with [Cole + Russell].  [Faulkner] assumes the responsibility of keeping
> [CHC] properly informed with respect to communications provided to it by
> [Cole + Russell] and its Consultants.

Design Services Agreement ¶ 1.7.

  The primary thrust of Cole + Russell's motion is that paragraph 2.1.3.6 of the Design

Services Agreement does not bar conduct Faulkner claims constituted a breach.  Because the

factual bases of Faulkner's counterclaim are presumed true for the purposes of this motion,

resolution of Cole + Russell's motion reduces to an issue of contract interpretation.  As a result,

the rules of interpretation outlined above are applicable here as well.

  **B.   Discussion.**

  A close reading of Faulkner's counterclaim reveals the occurrence of two alleged

breaches.  First, Faulkner alleges Cole + Russell performed work as directed by CHC and the

City without first consulting Faulkner; second, Faulkner claims Cole + Russell directly com-

municated with representatives of CHC and the City.  For ease of analysis, these arguments are

addressed in reverse order.

### 1.    Would Communications Between CHC or the City and Cole + Russell Constitute a Breach?

In its Counterclaim, Faulkner alleges Cole + Russell breached the Design Services Agreement by "communicating directly with representatives of CHC and the City."  Countercl. ¶ 12.  In its resistance to Cole + Russell's motion, however, Faulkner argues it "does not contend [Cole + Russell] could not communicate with [CHC], Marriott, and others in order to collaborate on the design process," but instead, and rather cryptically, presses that Cole + Russell's "communication with City/CHC went far beyond mere communication, but extended into a violation of the contract language."  Faulkner does not provide a factual or legal delineation between "mere communication" (which the Design Services Agreement apparently allows) and the apparently more sinister "communication" (which it does not).

Paragraph 1.7 of the Design Services Agreement is of no help to Faulkner.  Paragraph 1.7 requires Cole + Russell to "exercise its reasonable professional efforts to communicate with [CHC] only through [Faulkner] unless otherwise directed by [Faulkner] in writing."  Two observations follow.  First, paragraph 1.7 does not <u>require</u> Cole + Russell to communicate with CHC only through Faulkner; Cole + Russell need use only "reasonable professional efforts" to do so.  Conversely, paragraph 1.7 does not <u>prohibit</u> Cole + Russell from engaging in direct communications with CHC representatives; Cole + Russell need only exhibit "reasonable professional efforts" to avoid doing so.  Second, the first sentence of paragraph 1.7 does not require Cole + Russell to obtain written permission from Faulkner before communicating directly communicate with CHC.  Reading the clause as a whole requires the interpretation that permission is required to vary Cole + Russell's duty to exercise professional efforts to communicate through Faulkner.

Additionally, unlike paragraph 2.1.3.6, paragraph 1.7 does not purport to regulate communication between Cole + Russell and <u>the City</u> at all.  It follows that if Cole + Russell communicated with representatives of the City, that communication cannot form the basis of a breach of section 1.7.

In paragraph 2.1.3.6, Cole + Russell and Faulkner "agree[d] that the design process for the Project is a collaborative one," and that nothing in the Design Services Agreement was "intended to limit the free flow of communications, data and information regarding the project among [Cole + Russell], [Faulkner], [CHC], City, [CHC]'s Authorized Representative, Marriott, and the Trustee, and among others, as appropriate for the best interests of the Project."  Design Services Agreement ¶ 2.1.3.6 (emphases added).  This paragraph contemplates the need for "[CHC], City, [CHC]'s Authorized Representative, Marriott, Trustee, and perhaps others, . . . to review and provide comment regarding [Cole + Russell]'s Deliverables."  Id. (emphasis added). While Faulkner was the only entity that could issue comments to Cole + Russell that would constitute formal approval of Cole + Russell's Deliverables, nothing in paragraph 2.1.3.6 barred other communications between Cole + Russell and CHC or the City.  Instead, to further the collaborative design process, communication among all parties to the Project was encouraged. As a result, paragraph 2.1.3.6 makes clear that if Cole + Russell communicated directly with the City and CHC, the mere fact that communications occurred did not violate the Design Services Agreement.

To the extent Cole + Russell's motion challenges Faulkner's allegations that a breach of the Design Services Agreement occurred because direct communications occurred between Cole + Russell and either the City or CHC, Cole + Russell's motion is **granted**.  The conduct Faulkner has alleged simply cannot constitute a breach of the paragraphs of that agreement Faulkner has identified.

### 2.    Would Cole + Russell's Incorporation of Suggestions or Comments by the City or CHC into the Design Plans Constitute a Breach?

Faulkner next alleges Cole + Russell breached the Design Services Agreement by performing work as directed by the City and CHC without consulting with or seeking approval from Faulkner.  Key to the Court's analysis is Cole + Russell's decision not to dispute the factual allegations this argument assumes.

73

The Design Services Agreement, Cole + Russell argues, in no way prevented the incorporation of suggestions or comments from CHC or the City into the Project designs. Cole + Russell points out that because paragraph 2.1.3.6 required the design process to be collaborative, Faulkner was obligated to include input or recommendations by the City or CHC in its own comments and approvals of Cole + Russell's designs. Cole + Russell claims that because Faulkner was required to include such input and recommendations in what it relayed to Cole + Russell, Cole + Russell could not breach paragraph 2.1.3.6 by directly incorporating suggestions and recommendations into the designs.

As noted above, paragraphs 1.7 and 2.1.3.6 encourage the free flow of information among CHC, the City, Cole + Russell, Faulkner, and other parties. There is, of course, a difference between reviewing and providing commentary and suggestions about design plans and approving those plans. Unlike mere commentary about Cole + Russell's design plans, the Design Services Agreement placed sole authority for approval of Cole + Russell's design plans with Faulkner. For example, Faulkner and Cole + Russell agreed that "[o]nly [Faulkner] shall have the authority and responsibility to issue comments to [Cole + Russell] that will be considered an approval of [Cole + Russell]'s Deliverables." Design Services Agreement ¶ 2.1.3.6. Additionally, Cole + Russell and Faulkner agreed that "to maintain the Design Schedule and avoid unnecessary redesign efforts by [Cole + Russell], [Faulkner] will be the single point of formal approval for [Cole + Russell's] Deliverables." Design Services Agreement ¶ 2.1.3.6. As a result, Faulkner alone could "issue comments . . . that [could] be considered an approval of [Cole + Russell]'s Deliverables." Design Services Agreement ¶ 2.1.3.6; see also Design Services Agreement ¶¶ 1.4 ("[Cole + Russell] will . . present [the Deliverables] for the review, evaluation, consideration and approval of Faulkner . . . ." (emphasis added)); 2.1.3 ("Upon receipt of written authorization to proceed, . . . [Cole + Russell] shall prepare, for review and approval by Faulkner, [the Construction Documents Deliverables]." (emphasis added)); 2.1.3.1

("Upon final approval of the Construction Documents by [Faulkner], . . . [Cole + Russell] shall deliver professionally sealed and signed sets of the 'Final Issued For' Construction Documents . . . ." (emphasis added)).

Perhaps most importantly, in paragraph 2.1.3.6 Faulkner and Cole + Russell agreed that before Faulkner issued any "comments and approvals," Faulkner "shall be presumed to have consulted with and incorporated the comments, evaluations, recommendations and other input of [CHC], City, [CHC]'s Authorized Representative," and others.  Design Services Agreement ¶ 2.1.3.6.  As a result, Faulkner's comments constituting approval of Cole + Russell's designs should have encompassed those "comments, evaluations, recommendations, and other input" originating with the City, CHC, and others.  If a precise overlap between the designs Faulkner approved and those Cole + Russell produced did not exist, then Cole + Russell incorporated changes into the design without regard for Faulkner's status as the "single point of formal approval."

A careful reading of Faulkner's counterclaim reveals that is precisely what Faulkner claims occurred.  Faulkner alleges that "CHC specifically authorized [Cole + Russell] to perform additional design services beyond those contemplated in the Letter Agreement."  Countercl. ¶ 11.  Faulkner also contends "CHC compelled such activity to be performed contrary to the terms of the Letter Agreement, and [Cole + Russell] perform [sic] such services without consultation with [Faulkner]."  Id.  And it is "[b]y performing work as directed by CHC and the City" that Faulkner claims Cole + Russell breached the Letter Agreement and Design Services Agreement.  Id. ¶ 12.  Insofar as Cole + Russell accepted any "approval" of its Deliverables by either the City or CHC by incorporating their suggestions or requests without first funneling these suggestions or requests through Faulkner for approval, that scenario would constitute a breach of the Design Services Agreement.

Because Cole + Russell challenges the legal significance of the facts underlying Faulkner's counterclaim – not the validity of the facts themselves – this portion of Cole + Russell's motion fails.[22]

### C.     Conclusion.

Cole + Russell's Cross-Motion for Summary Judgment must be **granted in part and denied in part**.  Cole + Russell's motion is **granted** insofar as Faulkner's counterclaim is premised upon a purported breach of the Design Services Agreement occurred as a result of communications between Cole + Russell and either the City or CHC.  Cole + Russell's motion is **denied** insofar as Faulkner has alleged the occurrence of a breach of the Design Services Agreement occurred as a result of Cole + Russell's performance of work directed by the City or CHC without first consulting with Faulkner.

## V.     Conclusion.

Faulkner's Motion for Summary Judgment (Clerk's No. 70) must be **denied**.  The Motion for Partial Summary Judgment filed by the City and CHC (Clerk's No. 79) is **granted**; Count VI of Faulkner's Third-Party Complaint must therefore be **dismissed**.  Cole + Russell's Cross-Motion for Summary Judgment (Clerk's No. 75) is **granted in part and denied in part** as set forth above.

**IT IS SO ORDERED.**

Dated this 15th day of December, 2006.

JAMES E. GRITZNER, JUDGE
UNITED STATES DISTRICT COURT

---

[22] Because Cole + Russell challenges solely the legal impact of allegations found in Faulkner's pleadings, it follows that the Court need not resolve any inconsistency between permitting Faulkner's counterclaim to survive and extinguishing Faulkner's intentional interference with contract claim against Boyd, CHC, and the City.